PANHANDLE NATIONAL BANK v. CHARLES F. EMERY.

No. 2928.

1.  **Description of Cattle Mortgaged.** — In a mortgage upon 1500 head of she cattle in given marks and brands, there being nothing to show that there was a greater number in the brands, such description is sufficient.

2.  **Equitable Lien upon Property of Corporation.**—Upon the dissolution of a corporation there is an equitable lien upon its property in the hands of the stockholders, or of persons taking with notice, in favor of the creditors of such corporation.

3.  **Same—Dissolution of Corporation.**—Nor would the fact that the corporation had not been legally dissolved by law affect the principle upon the stockholders parcelling out the property of the corporation among themselves, with the express agreement subjecting the property to its debts.

4.  **Power of President of National Bank.** — Where a bank holds a claim the

president may, for the purpose of making the debt, take from the debtor cattle encumbered by other debts; such act binds the bank, and upon its disposing of the property it is liable to the prior lien holders upon such cattle.

5. **Joinder of Actions.** — A holder of a claim against a cattle company after the dissolution of the company, having an equitable lien upon its property, may join with a suit to enforce such equitable lien a suit upon a mortgage upon a part of said cattle, and that without alleging that the cattle mortgaged were insufficient to discharge the debt.

6. **Ratification—National Bank.**—Stevens conveyed to James, president of the Panhandle National Bank, a number of cattle, upon the express agreement by James, acting for the bank, that certain liens upon the cattle were to be paid by him. Subsequently James upon nominal consideration deeded the cattle to the bank, which subsequently disposed of the cattle and held the proceeds. *Held,* it was not error in the court to charge that if the bank at the time it took the conveyance from James knew of the understanding between James and Stevens, and that Stevens relied upon the bank taking up the liens, to find against the bank in favor of a creditor holding lien.

7. **Charge.**—It is not error to refuse to charge upon the effect of isolated facts. See example.

8. **Power of President of National Bank.** — We know of no reason why a national bank corporation may not, for the purpose of collecting a debt due to it from a creditor otherwise unable to pay the debt, take in payment property encumbered by other liens, such liens being still operative upon the property so taken.

9. **Same — Ultra Vires.** — A bank after receiving property contracted for by its president, while enjoying the fruits of the transaction, can not be absolved from the performance of its obligations to others assumed by its officers as a means of getting possession of the property, on the plea that its acts were *ultra vires.*

10. **Payment of One of Several Debts.**— The payment by the bank of one of several debts recognized as liens upon the cattle and assumed by it in buying the property can not be pleaded in offset in a suit to enforce another claim having lien upon it, nor can the doctrine of subrogation apply to such facts.

11. **Unrecorded Bill of Sale for Cattle on Range.**—Article 4564 of Revised Statutes, and its interpretation in Black v. Vaughan, 70 Texas, 47, requiring that a bill of sale for cattle on the range be recorded to give it effect, will not be extended to facts where the vendee named in the bill of sale not recorded has received and actually taken possession of the cattle. A court of equity under such circumstances will require the purchaser to do equity without regard to defects attending the attempted transmission of title.

12. **Letters by a Bank President.**—Letters relating to a transaction of the business of a bank written by the president of the bank, who negotiated the transaction, are competent against the bank in a controversy growing out of such transaction.

13. **Declarations by Agent.**—An attorney acting for the bank sent to the cattle range to collect and receive cattle sold to bank, while engaged in the work declared he would pay off the liens upon the cattle. *Held,* the declarations were incompetent, but as the facts fixing liability of the bank were established otherwise the testimony was immaterial and no ground for reversal.

APPEAL from Wichita.    Tried below before Hon. P. M. Stine.
The opinion gives a statement.

*Ball, Wynne & McCart,* for appellant.— 1. The court erred in over-ruling the defendant Panhandle National Bank's general demurrer to plaintiff's petition. Jones on Chat. Mort., secs. 55, 56; Everett v. Brown, 20 N. W. Rep., 743; Price v. McComas, 31 N. W. Rep., 511; Tabor v.

Sampson, 4 Pac. Rep., 45; Grimes v. Connell, 36 N. W. Rep., 479; Warner v. Wilson, 36 N. W. Rep., 719.

2.   The court erred in its charge to the jury wherein it charged that the effect of the bill of sale to the cattle in controversy by E. T. Stevens to John G. James, dated July 19, 1887, was to make the bank liable for the debt sued on, if at the time of said conveyance said Stevens and said James understood said conveyance to be to the bank, and understood and intended that the bank was to assume said debt, and that if the bank afterwards took said cattle and disposed of them, knowing said Stevens' intention and understanding, it would be liable to plaintiff for the debt sued on.

3.   The court erred in that part of its charge to the jury where it instructed the jury to foreclose the mortgage of the plaintiff herein sought to be foreclosed on the cattle in controversy, because the same was ineffectual to fix any lien on any cattle, because there was no sufficient description of any cattle in said mortgage, and because said mortgage failed to state where said cattle were at the time of said mortgage—that is in what county, what State—or to whom they belonged, or to give any other sufficient definite description of the same so as that the said mortgage could be enforced.

4.   The court erred in refusing to give special charge asked by defendant Panhandle National Bank, that "The bill of sale introduced in evidence from E. T. Stevens to John G. James, of date of the 19th day of July, 1887, the same not having been recorded, and the cattle therein described at the time of said conveyance or bill of sale being running at large upon the range in Hardeman County, you are instructed that said bill of sale is of no legal force or effect to pass title to said James to said cattle, and therefore you are instructed that you will not consider the same in making up your verdict in this case." Rev. Stats., art. 4564; Black v. Vaughan, 70 Texas, 47.

5.   The court erred in refusing to give special charged asked by the defendant Panhandle National Bank, that "The president of a national bank has no inherent power as such president to bind the bank by express promises unless specially authorized by the board of directors to do so, or his acts have been ratified by said bank, acting through its said board of directors; and when the president of such bank attempts to bind his bank by acts of his beyond the scope of his authority and not especially authorized by said bank, such acts are *ultra vires*, beyond his power, and void, unless they are afterwards ratified by said bank in some legal and binding manner." Bank v. Drake, 35 Kans., 564; Gashwhiler v. Willis, 91 Am. Dec., 607.

6.   The court erred in admitting in evidence the mortgage or deed of trust from the Falls Land and Cattle Company to Charles F. Emery to

secure the debt sued on by plaintiff, as shown by defendant bank's bill of exceptions. [See opinion.]

7. The court erred in permitting plaintiff to read in evidence the letter from John G. James to Cowherd Brothers, as shown by defendant bank's bill of exception. [See opinion.] 1 Whart. Ev., par. 173; Salado College v. Davis, 47 Texas, 131; Bank v. Todd, 1 A. K. Marsh., 157.

*W. W. Flood* and *Hunter, Stewart & Dunklin,* for Charles F. Emery and Cowherd Bros.—The fifteenth assignment of error raises the only question of any importance involved in this case, i. e., the question of the bank's liability, and we submit that the charge on that question is correct. It involves the simple proposition of law, based upon sound principles of equity, that if Stevens intended by the bill of sale of the cattle to place the actual title thereof in the bank, and James, the president of the bank, intended that the bank should take all the benefits of the transfer and pay the consideration, and the bank did in fact take the cattle and use them for its own benefit, knowing that Stevens so understood the trade, that this was a sale to the bank, notwithstanding the fact that the transfer of the legal title to the cattle was made to the president of the bank, John G. James.

Principal is liable although agent may sign his own name, if contract made for benefit of principal. Story on Ag., secs. 266, 269, 270 (note 3), 446, 451.

Parol proof may be used to show that the contract was made for the benefit of the principal. Story on Ag., secs. 169a (note 2), 161 (note 1, p. 103), 162 (note 2, p. 194); Mecham on Ag., sec. 695; Clark v. Haney, 62 Texas, 511; Gibbs v. Penny, 43 Texas, 560; McClenny v. Floyd, 10 Texas, 159; Meade v. Randolph, 8 Texas, 191.

Ratification by principal. Receiving and retaining the fruits of the agent's acts is a ratification. 17 Texas, 560; 16 Texas, 461; 1 Wait's Act. and Def., pp. 232, 234; 3 Wait's Act. and Def., p. 488; Story on Ag., secs. 242, 244, 250; Ang. & Ames on Corp., secs. 304, 305; 2 Myers' Dig., p. 967, sec. 57; 8 Wait's Act. and Def., p. 44, sec. 4.

Dealing with the president of a national bank binds the bank. Morse on Banks, pp. 12, 85, 86, 96, 105, 123, 144.

Notice to president is notice to board of directors. Morse on Banks, pp. 126, 127, 129; Mecham on Ag., secs. 729, 730.

President of national bank can purchase property to pay debt due the bank. Morse on Banks, pp. 565–567.

The transaction is not within the statute of frauds, and Emery, the plaintiff, may sue on the promise being made for his benefit although not made to him. Spann v. Cochran, 63 Texas, 240; 20 Texas, 333; 59 Texas, 642; 22 Howard, 28–43; 20 Texas, 329; Mecham on Ag., secs. 148, 150; Wood on Mast. and Serv., sec. 271.

A national bank may purchase property in order to collect a debt due to it, and if the property is encumbered with other liens may lawfully assume to pay off the liens as part of the consideration.   Mapes v. Scott, 88 Ill., 352; 54 N. Y., 671; 4 Neb., 334.

HENRY, ASSOCIATE JUSTICE. — This suit was brought by appellee against the Falls Land and Cattle Company, Fletcher Cowherd, Walker Cowherd, E. T. Stevens, John E. Wilson, John G. James, and the Panhandle National Bank, to recover the amount of a promissory note executed by the Falls Land and Cattle Company to appellee, and to foreclose a mortgage executed by the maker of the note to secure it.

Plaintiff alleges that on the 13th day of February, 1885, the said Fletcher Cowherd, Walker Cowherd, E. T. Stevens, and John Wilson made and endorsed in writing their written guaranty on said note.

Plaintiff further alleges the execution of a mortgage by the Falls Land and Cattle Company on the same day to secure the payment of said note on "1500 head of the cattle branded □ K on the left side, with ear marks as follows," giving marks.

The future increase of said herd was excepted from this lien.

Plaintiff alleges that "by said deed it was intended to convey all of the she cattle in said mark and brand belonging to said company at said time.   Plaintiff further alleges that at the time of the creation of the debt said Fletcher Cowherd, Walker Cowherd, John Wilson, E. T. Stevens, and one A. S. Kindred were the owners of all of the capital stock of said corporation, and that afterwards on the 18th day of June, 1886, said parties by common consent dissolved said corporation and ceased to act and do business under its charter, and apportioned the liabilities, assets, and effects thereof among themselves, according to their respective interests.

"At said time said corporation owned other valuable property than that upon which the lien was given to plaintiff, and such property consisted largely of stock cattle, numbering some 6500 head, and about 100 head of horses, and in various brands as follows (giving brands), and amongst which were included the 1500 head of she cattle upon which plaintiff had a mortgage lien as aforesaid.

"In the apportionment and division of the assets and effects of said corporation amongst its stockholders all of said stock of cattle and horses were set apart and apportioned to John E. Wilson and E. T. Stevens as their portion of its assets, and was so accepted by them and concurred in by all of said stockholders; that in consideration thereof said Wilson and Stevens agreed to pay at maturity the indebtedness due to plaintiff sued on herein; all of which the said Wilson, Stevens, and John G. James as security for the said Stevens, then and there promised and bound themselves to do.

"At the time of the creation of plaintiff's debt all of said cattle and

. horses belonged to and were in the possession of the Falls Land and Cattle Company, and remained their property and in their possession long afterward, and until the division of the property and assets of said company as aforesaid.   All of said cattle and horses other than those named in said mortgage were encumbered in the hands of said Wilson and Stevens with an equitable lien for the payment of plaintiff's debt.   Afterwards the said Wilson, for value, sold and delivered all of his interest in said cattle and horses, etc., to the said E. T. Stevens, upon consideration, among other things, that said Stevens would pay off and discharge the debt due plaintiff, and for this consideration all of said cattle and horses were delivered to said Stevens.

"At said time the said Stevens was indebted to the Panhandle National Bank in the sum of $25,000, and was unable to pay said indebtedness and was wholly insolvent, and in order to secure and make good said indebtedness of said Stevens to said bank said Stevens conveyed and delivered all of said cattle and horses to John G. James for the benefit of said bank, among which was included 1500 head of she cattle on which plaintiff had a mortgage lien; the consideration of said purchase from said Stevens being, among others, that said bank, acting by and through John G. James, its president, would pay off and discharge certain debts of said Stevens, and among others the debt and interest thereon due plaintiff.

" The contract of sale between said Stevens and said James for said bank was in writing, and is now and has been since said purchase in the possession of said bank.   All of said cattle and horses, other than those named, on which plaintiff had a mortgage lien remained charged and encumbered with equity lien for the payment of plaintiff's debt as aforesaid. Said property is held by said bank and is now in the possession of said bank, with full knowledge of said facts.   The several conveyances executed to said bank conveying said property recited a consideration of $1, but the true consideration was as hereinbefore alleged.

" In pursuance of said purchase of said cattle by said James for said bank, all of said cattle and horses were delivered by the said Stevens to said James for said bank.   That the bank has disposed of said cattle and horses and converted the proceeds thereof to its own use, and has failed and refused to satisfy plaintiff's debt as it promised to do."

The mortgage was attached as an exhibit to the petition.

The defendants Cowherd Brothers answered and substantially set up the same facts as those averred by plaintiff, and claimed a judgment over against E. T. Stevens, John E. Wilson, the Panhandle National Bank, and John G. James for the amount of the note sued on, in their favor, should a judgment be rendered against them.

E. T. Stevens and John E. Wilson both answered, stating about the same facts as those averred by plaintiff, and claimed judgment over against

the Panhandle National Bank and John G. James in the event any judgment should be rendered against them in this cause.

John G. James answered by general demurrer and general denial, and also a special plea in which he prayed, if judgment should be rendered against him, for a judgment over against the defendant bank.

The Panhandle National Bank answered by filing general and special demurrers and a general denial, and further averred that at the time of the execution and delivery of the mortgage described in plaintiff's petition said Falls Land and Cattle Company was the owner of a number of other she cattle in the same marks and brands as those described in said mortgage over and above said 1500 head, to-wit, 2000 head, which were running and ranging in the pasture and held in the possession of said company together with said 1500 head of she cattle, the said cattle being mingled together indiscriminately in such a manner that it was impossible to separate those attempted to be mortgaged from other cattle in the same mark and brand.

The answer contained many other allegations not necessary to mention in detail.

Judgment was rendered in favor of plaintiff against all of the defendants for the amount of his demand and for foreclosure of his mortgage, and judgment over was rendered in favor of each of the other defendants against the defendant bank.

The defendant bank demurred generally to plaintiff's petition, and also specified the following grounds of demurrer:

1. Because of the vague and indefinite description in the mortgage of the cattle and their situation.

2. Because, while the petition sets up an equitable lien on cattle and horses other than those mentioned in the mortgage, and seeks to make the defendant bank liable for the value thereof, it fails to charge that the property mentioned in the mortgage is insufficient to satisfy the debt sued for or that there is any necessity or equitable reason for subjecting the other cattle and horses for the payment of the said debt.

3. Because so much of the petition as seeks to recover against the defendant bank upon facts other than those relating to the mortgage is irrelevant to the suit for the foreclosure of the mortgage and shows a misjoinder of actions.

4. Because the petition does not state facts showing a lawful dissolution of the Falls Land and Cattle Company.

5. Because John G. James, as president of the defendant bank, could not, as in the cross-bill averred, bind the bank for the payment of plaintiff's debt, and the petition fails to show a valid agreement to that effect.

We do not think that there was error in overruling the demurrers.

There is nothing upon the face of the pleadings or the mortgage made an exhibit to the petition indicating that the cattle mortgaged were only

a part of a large number of the same description.   In the absence of something of the kind it can not be said that the pleadings do not sufficiently describe the property intended to be mortgaged.

Upon general principles the creditors of the Falls Land and Cattle Company had an equitable claim upon its assets, which would follow them into the hands of its stockholders and others holding under them with notice after they had been partitioned and appropriated by them.   Bank v. Investment Co., 74 Texas, 436.

The property having been accepted and appropriated with an express agreement that the stockholders taking it would pay the debts of the corporation, it can not be doubted that it was charged with a trust for the payment of the debts against the stockholders who made the promise and all holders under them with notice.

The fact that the Falls Land and Cattle Company was not lawfully dissolved by the surrender of its property to its stockholders without the payment of its debts does not affect the principle just stated or its application.

The facts stated in the petition are sufficient to show authority in James to bind the defendant bank, and to show that it was in fact bound.

It was proper for the plaintiff to unite in the same suit his remedy upon the mortgage and his equities connected with the appropriation of the property, and it was not incumbent upon him to allege that the mortgaged property was insufficient security before resorting to the other remedy.

The transactions with regard to the division of the property of the Falls Land and Cattle Company and subsequently between Wilson and Stevens were found substantially as alleged.

The mortgage to secure plaintiff's note made by the Falls Land and Cattle Company on the 13th day of February, 1885, was introduced in evidence, but we find in the record no evidence showing how many cattle there were in the herd on that date of the description mortgaged; nor do we find any evidence indicating that the cattle company then owned a larger number of that description of cattle than the number mentioned in the mortgage.

The following instrument was introduced in evidence:  " Know all men by these presents, that I, E. T. Stevens, of Hardeman County, Texas, for and in consideration of the sum of $36,758.08 cash in hand paid to me by John G. James, of Wichita Falls, Texas, receipt whereof is hereby acknowledged, and the further consideration of the assumption by said John G. James of the following obligations, to-wit, one certain note of $10,000 made by Falls Land and Cattle Company to Charles F. Emery, due February 13, 1888, and secured by deed of trust to W. J. Elliott, trustee;  one certain note of $15,000 made by Falls Land and Cattle Company to Missouri Union Trust Company, less all payments made on same to date, due in October last, and secured by deed of trust to Shannon C. Douglas,

trustee; one certain note of $3600, dated June 18, 1886, made by E. T. Stevens to J. E. Wilson, due one year after date; one certain note of $8200, dated June 18, 1886, made by E. T. Stevens to J. E. Wilson, due two years after date; one certain note of $8200, dated June 18, 1886, made by E. T. Stevens to J. E. Wilson, due three years after date; have granted, bargained, sold, and by these presents due grant, bargain, sell, convey, and deliver unto the said John G. James all that certain stock of cattle late the property of the Falls Land and Cattle Company and now owned by me, and composed of the following brands of cattle, to-wit, all cattle branded (giving brands), and all other brands formerly owned or used by said Falls Land and Cattle Company and now my property, whether expressly mentioned herein or not, and all the increase of all the above mentioned brands, whether branded in those brands or in any other brands, or which may be now unbranded, from June 18, 1886, until date of this instrument, the said stock of cattle composed of about 7100 head of cattle, and ranging and running now in Archer, Wichita, Wilbarger, Hardeman, Greer, and adjacent counties in Texas, and in the Indian Territory; also thirty-nine head of horses branded (giving brand), now ranging with said cattle and used as saddle horses in running said cattle, and including all the horses in those brands; also the wagons, harness, implements, and general ranch equipments used by me in running said cattle. To have and to hold unto the said John G. James, his heirs and assigns forever. And I hereby bind myself, my heirs, executors, and administrators to forever warrant and defend the title to the above described property unto the said John G. James, his heirs and assigns, against any person whomsoever lawfully claiming or to claim the same or any part thereof.

"In witness whereof I hereunto set my hand, at Wichita Falls, Texas, this 19th day of July, 1887.

"E. T. STEVENS."

John G. James testified that he was at the date of said transactions and up to about the 20th day of June, 1888, president of the Panhandle National Bank.

Referring to the division of the property of the Falls Land and Cattle Company between its stockholders, he testified as follows: "It was brought about by myself for the sole benefit of the bank and in my official capacity as president of said bank. I was induced to bring this transaction about because E. T. Stevens, one of the stockholders of the said cattle company, was largely indebted to the bank, and the object was for the bank to get absolute control of the Stevens interest in said cattle company. In bringing this about I was acting in the capacity of president of said bank and for its sole benefit. I had no individual interest in the transaction. The real estate of the company was transferred to Fletcher and Walter Cowherd and the live stock to John E. Wilson and E. T. Stevens, and in order to equalize the division each party assumed certain indebtedness of the

company.   Wilson and Stevens assumed the payment of the mortgage held by Charles F. Emery and also one held by the Missouri Union Trust Company.   Wilson conveyed his interest in the cattle to Stevens subject to said liens.   E. T. Stevens conveyed said cattle to me on the 18th of June, 1886, by bill of sale as collateral security for the amount he owed the bank.   It was made wholly in the interest of the bank and for its security.   It was understood that the bank on getting possession of the cattle took them subject to the liens resting on them when it received them, and that it, the bank, would either have to sell or give up the cattle to pay said liens, or pay them off to secure itself and keep the cattle.   The amount of the liens was as follows:   Charles F. Emery & Co. claim, $10,000; Missouri Union Trust Company, about $9000;  John E. Wilson claim, about $20,000; of which the Missouri Union Trust Company mortgage was paid by the said bank partly from the proceeds of said cattle.

" Wilson's mortgage was paid in full by the bank, partly with cows and calves out of said stock.   The expense of keeping the cattle after the 18th day of June, 1886, was paid by the bank and out of money received from the sale of cattle."

On a subsequent examination this witness testified in substance as follows:

"I heard the testimony of Mr. Stevens in regard to this transfer of date July 19, 1887.   I remember the date of this transaction.   As I recollect it it was a transfer to me of his interest in that stock of cattle for the purpose of securing his indebtedness to the bank; they were conveyed to me as trustee for the bank.   It was in consideration of the canceling and giving up to him of all the notes the bank had against him.   There was no authority given me by the bank to make the trade that I did.   This property was put into my hands to secure the bank.   I didn't regard it that I had obligated the bank to pay any debt at all.   I took the cattle.   I was president of the bank, and while those cattle were being held in my name, they were being held for the purpose of paying off the indebtedness of Stevens, so far as they would.

"I have no recollection of ever having assumed for the bank as president of the bank the payment of these debts as consideration for the transfer of these cattle.   If I had done it I think I would recollect it.   That deed does not show that it has ever been recorded.   (Bill of sale from Stevens to James, dated July 19, 1887.)   That instrument, dated the 18th day of June, 1886, which purports to be a bill of sale from Stevens to me for the cattle, was taken for the purpose of more fully securing the bank in the loans that it had made to Stevens.

"There was no purchase of the cattle by me.   There are no minutes of the bank or its directors whereby I was authorized to make any statements, stipulations, or agreements with anybody.   My recollection is I was going on my own judgment at the time.   There has been no subsequent meet-

ing of the board of directors ratifying my acts that I know of.   After Stevens went out the account was run in the name of F. W. James, as attorney.   I could not tell from recollection whether or not all these payments were made on the account in that way.   My understanding of it was that I did not bind the bank by that action; it was not my purpose, because I thought the cattle here was sufficient to pay these debts.   That was the way the instrument was made.   As to whether the bank was to pay the debts that I was to assume and take the cattle, was a matter for the bank to say.   It was not my intention to bind the bank to assume any more debts of Stevens, or any one, further than the cattle themselves would pay.   I supposed the cattle would pay these debts.   The bank accepted these cattle afterwards and sold them and paid these debts off, except the Emery debt.   The difference between the assumption of the Emery debt and those other debts the bank did pay is a legal question I can't answer.

"I don't recollect the dates, but I think the bank did pay off the Missouri Union Trust Company debt after I got these cattle under the bill of sale.   I don't know whether I have paid three of these coupons of the Emery debt since I got the cattle or not, but have paid some.   I have not paid a dollar individually on these debts; I didn't intend to pay any out of my own individual means if I could help it.   I don't know whether Stevens and Wilson understood the bank was to pay these debts or not; I don't know what they understood about it.   We had the expense account of the cattle kept in name of F. W. James, because some one had to draw the checks and he drew the checks himself.   He was the agent of the bank, and I regarded the cattle at the time as being in the possession of the bank and being in F. W. James' possession.   I could not tell how many cattle the bank has sold since the date of that bill of sale in 1887.   I think they have sold them all, but I have ceased to have any connection with the bank since June, 1888, and I only know by hearsay.   Up to the time I quit the bank they had turned over 1000 head to Colonel Wilson, and then we sold some fifty head, I think, of Stevens to Mr. Chick.   I think that was applied to the payment of the Missouri Trust Company debt.   The 350 head that were shipped to Chicago were to pay the Missouri Union Trust Company debt.   That was one of the debts that I assumed in that bill of sale; the bank paid that out of the cattle.   Everything that has been paid on these debts has been paid by the bank.   I have not paid any of them individually.   I was president of the Panhandle National Bank about three or four years, and its management and control was left almost entirely to my judgment by the board of directors.   I never made such a transaction as this before; it is the only stock that we ever took.   They told me to exercise my judgment in all matters.   Well, when I say that, I am speaking unadvisedly.   It was sometimes left to my discretion without passing any specific order to that effect; the

affairs of the bank were administered by me mainly. This action though was never approved by any specific act of the board of directors. I think that there was a resolution of the board passed disapproving it. Yes, they kept the cattle all the same. I have heard that since this suit commenced they have sold the cattle to Harrold & Easton. I think this last sale was made some time last fall, long before October or November; I am not positive about it as to whether it was since this suit was brought or not, for I had no occasion to charge my memory with it. The board of directors disapproved my action in taking these cattle some time before they sold them. I think it was before this suit was brought. But, still, since then they have gone on and sold the cattle. They gave up their paper to the amount of about $35,000. They gave Stevens about $35,000 for the cattle. They represented to us that there were at the time we accepted them 7100 head of cattle there. I knew nothing of the number."

The court charged the jury as follows:

"1. You are instructed to find for the plaintiff against the defendants the Falls Land and Cattle Company, Fletcher Cowherd, Walker Cowherd, E. T. Stevens, and John E. Wilson and John G. James the sum of $11,614.99, and you will also find for plaintiff the foreclosure of his lien upon the property described in the trust deed introduced in evidence.

"2. If you believe from the evidence that the bill of sale made by E. T. Stevens to John G. James, of date of July 19, 1887, was intended by the parties thereto as a sale of the property therein mentioned to the Panhandle National Bank, and that the said bank was the party to be held liable on the obligation therein contained to assume the payment of the debt herein sued on, and that said bill of sale was made to enable the said bank to collect its debt against said Stevens, and if you find that the said bank, knowing that Stevens relied upon said bank to fulfill such contract, received and took possession of the cattle conveyed by said bill of sale and has used the same as its own property, then the agreement is binding on the bank, and you will find for plaintiff against said bank the sum of $11,614.99; but if at the time of such acts of ratification by the bank the bank did not have notice that the said Stevens relied upon said bank for the payment of the debt herein sued on, you will find for said bank.

"3. You will find in favor of Stevens and Wilson against John G. James the sum of $11,614.99.

"4. If you find in favor of the plaintiff against the Panhandle National Bank, you will find in favor of Stevens and Wilson and also in favor of James against said bank."

The appellant contends that the charge was erroneous in the following respects:

1. In directing that the effect of the bill of sale of the cattle made by E. T. Stevens to John G. James was to make the bank liable for the debt sued on, if at the time it was made Stevens and James understood that the

sale was made to the bank, and if the bank, knowing that Stevens relied upon it to fulfill the contract, took possession of the cattle and used them as its own property.

2.   In directing the foreclosure of the mortgage upon the cattle, because of the insufficient description of any cattle in the mortgage.

We do not find any objection to the charge in either particular.

The appellant complains of the refusal of the court to give charges at its request in substance as follows:

"1.   It is a rule of law that a person dealing with one known to be an agent, or claiming to be such, is bound at his peril to see that the agent has authority to bind his principal in such transaction, or that the agent is acting within the scope of his apparent authority.

"2.   The mere fact that the said John G. James received the conveyance of said cattle as trustee and acted in the matter of the settlement of said debts for said bank, and while so acting was president of said bank, and the fact that said bank and its officers had taken charge of the cattle in controversy in this case and sold the same, would not of itself alone be sufficient to charge said bank with the assumption of plaintiff's debt or make it liable for the payment of the same; neither would such acts on the part of said bank be sufficient to establish that said bank had ratified and assumed said obligation and agreement on the part of said John G. James in assuming or undertaking to pay the debts here sued on.

"3.   You are further instructed that no undertaking or agreement by John G. James to pay the debt of the Falls Land and Cattle Company, Cowherd Brothers, E. T. Stevens, and F. J. Wilson to the plaintiff in this case would in law bind said bank to pay said debt, unless you believe from the evidence that said John G. James was fully authorized by the board of directors of said bank to make said contract and agreement to pay plaintiff's debt, or that the board of directors of the bank, after they had been fully advised and informed of the undertaking of James, ratified and approved the same by a resolution or otherwise, with a full knowledge of all the facts and circumstances."

"4.   You are instructed that a national bank corporation has no authority in law to go security or bind itself as guarantor or surety for third parties.

"5.   That the bill of sale introduced in evidence to you from E. T. Stevens to John G. James, of date of the 19th day of July, 1887, the same not having been recorded, and the cattle therein described at the time of said conveyance or bill of sale being running at large upon the range in Hardeman County, you are instructed that said bill of sale is of no legal force or effect to pass title to said James, and therefore you are instructed that you will not consider the same in making up your verdict in this case.

"6.   The jury are instructed that if they believe from the evidence.

that the Missouri Union Trust Company had a valid claim against the Falls Land and Cattle Company, Cowherd Brothers, E. T. Stevens, and J. T. Wilson, and that there was executed on the 31st day of October, 1885, a mortgage on the cattle and lands belonging to said Falls Land and Cattle Company to secure the same, and that said Panhandle National Bank had a lien on said property subsequent to said lien for the payment of the debt of E. T. Stevens to said bank, and that in order to preserve the said lien of said Panhandle National Bank upon said property or any part thereof said Panhandle National Bank was compelled to pay off and discharge, and did pay off and discharge said debt of the Missouri Union Trust Company, or any part thereof, then you are instructed that said Panhandle National Bank would by said payment be subrogated to the rights of the said Missouri Union Trust Company in and to said demand, and that said Panhandle National Bank is entitled to have and recover of the said Falls Land and Cattle Company, J. E. Wilson, E. T. Stevens, Fletcher Cowherd, and Walker Cowherd so much of said debt as you believe from the evidence said bank has paid off and discharged; and if you so believe you will find a verdict in favor of said Panhandle National Bank against said Falls Land and Cattle Company, J. E. Wilson, E. T. Stevens, and Cowherd Brothers, for the amount you may believe from the evidence said bank has paid off and discharged of said debt.

"7. The jury are charged that the president of a national bank has no inherent power as such president to bind the bank by express promises unless specially authorized by the board of directors to do so, or his acts have been ratified by said bank, acting through its said board of directors, and that when the president of such bank attempts to bind his bank by acts beyond the scope of his authority, and not especially authorized by said bank, such acts are *ultra vires,* beyond his power, and void, unless they are afterwards ratified by said bank in some legal and binding manner."

We are unable to conclude either as matter of law or fact that James, as president of the bank, did not in the first place have the authority to conduct the transactions that he did. Our opinion is that he did have such authority, and that it did not require a vote of the board of directors in each particular transaction to invest him with it.

If there was any question about his authority it would still remain that when the bank took possession of the property through its president, and with the full knowledge possessed by him of the equities with which it was charged, and proceeded to convert it to its own use, it thereby became liable, to the extent of the value of the property, for the payment of the debts of the cattle corporation.

We know of no reason why a national bank corporation may not, for the purpose of collecting a debt due to it from a creditor otherwise unable to pay the debt, have such transactions as occurred in this case.

At any rate, after having had them and received the property, it cannot,

while enjoying the fruits of the transaction, be absolved from the performance of its obligations to others assumed by its officers as a means of getting possession of the property on the plea that its acts were *ultra vires.*

The discharge of the debt to the Missouri Union Trust Company having been part of the consideration to be paid by the bank for the property, its payment of that debt can not be held to convert it into a creditor to the extent of that debt at the expense of plaintiff; nor can it be allowed in any manner to be an offset or defense to his claim.

We can not see in the transaction any ground for the application of the doctrine of subrogation.

The charge requested and refused, to the effect that the bill of sale from Stevens to James being for cattle then running at large upon the range, and not having been recorded, was of no legal effect to pass title to James, is based upon article 4564 of the Revised Statutes, reading:

" Persons may dispose of stock animals   *   *   *   as they run in the range by the sale and delivery of the brands and marks, but in every such sale the purchaser in order to acquire title thereto shall have his conveyance or bill of sale of such stock recorded in the county clerk's office," etc.

This court in the case of Black v. Vaughan, 70 Texas, 47, construing this statute, held that "in the case of cattle upon the range the bill of sale and its record are absolute prerequisites to the acquisition of title."

However that may be before there has been any delivery of the property, and when the title depends exclusively upon the bill of sale, the doctrine can not be extended to include a case where the property has been received and actually appropriated by the purchaser so as to absolve him from accounting for its value.   A court of equity will require a purchaser under such circumstances to do equity without regard to defects attending the attempted transmission of title.

We think that the charge requested would have been inapplicable to the real issues in this case and would have been misleading.

The defendant bank made the following objections to the introduction of evidence, all of which were overruled:

First to the introduction of the mortgage on the following grounds:

"1.   Because it fails to describe the cattle attempted to be mortgaged with sufficient certainty to identify the same.

"2.   Because it purports to have been executed in Wichita County, Texas, and was acknowledged in Jackson County, State of Missouri.

"3.   It fails to show where said cattle were at the date of the mortgage, in what county or State, to whom they belonged, in whose possession they were, or any sufficient description to either identify them or show any facts upon the face of the mortgage that would put a party upon an inquiry that would discover said cattle, and the same is therefore null and void and is no notice to the Panhandle National Bank."

What we have said upon the same subject when speaking of the ruling

upon the demurrers and charge may dispose of these objections, and also of the objections with regard to the registration of the mortgage.

Second, to the following letters:

"WICHITA FALLS, TEXAS, January 16, 1888.

"*Messrs. Cowherd Bros., Kansas City, Mo.:*

"DEAR SIRS—The last mortgage assumed by E. T. Stevens, the $10,000 Emery one, will be due February 1. I write to say that it will be impossible to meet it then, for the extraordinary stringency makes money extremely hard to get on any terms, and, as you well know, it is useless to talk about raising money on the cattle or selling them now. That mortgage is every dollar of debt on the entire stock, and will be paid as soon as we get around to the season for handling cattle. We have not less than $10,000 in steers, which can be sold and delivered as soon as roundup begins, and we are now contracting 1000 head of stock cattle for spring delivery. We shall aim to get $25,000 out of the cattle this spring and summer. Cattle so far all right, and went into winter in fair condition. We will want six months extension at furthest, and probably only three or four months, if grass springs early and we can gather and deliver young steers. I write to-day also to Emery, and trust he will arrange for the extension. You might see him too.

"Very truly yours,

"JNO. G. JAMES.

"P. S.—We can't find Emery's letter, and must ask you to see him. Don't know his address. Will hunt again. Send me his address."

"WICHITA FALLS, TEXAS, July 25, 1887.

"*Messrs. Cowherd Bros., Kansas City, Mo.:*

"DEAR SIRS—The bank being satisfied that Stevens has run the K cattle long enough to show that he could never pay out, last week forced matters to a conclusion. I assumed all obligations on the cattle and they were sold straight to me. I immediately took possession with proper outfit, discharged all Stevens' employes not needed, and cut down expenses at once. Fortunately Uncle Johnny Wilson was at Quannah, and we fixed a trade with him by which we settled his debt at about 50 cents on the dollar; that is we made a contract which will be carried out in day or two, we expect. We have started about 400 ones and twos, steers, to deliver to our contractors, Beals releasing the twos, which we then sold to Chick. We will pay promptly the note at Chick's bank at maturity, and you then have proper legal release made by the Missouri Union Trust Company and recorded, so as to release your land. If matters work out fairly well we will arrange to carry ourselves the other mortgage, provided parties will let us take it up before maturity.

"This change puts us in better shape, and you too, as our bank will see the whole matter through now without relying on Stevens. The latter, with some good qualities as a cow man, is radically deficient in busi-

ness capacity and has no executive ability. The longer he had control the deeper in all parties would be.

" We think the cattle are there to bring us out very nearly even, with economical management, and we are now trying to contract all grades for delivery at fall roundup. We would like much to turn off the bulk of them before winter, and expect to do it. We will sell in lots of 500 head or more dry cows, cows and calves, 2-year heifers, yearling heifers, on small cash payment, balance one, two, and three years, 8 per cent interest, paper to be well secured, real estate preferred; lien on cattle also retained. If you hear of any parties needing stock cattle let me hear. The low interest—and to an A1 man we would put it even 6 per cent—and long time should induce some good men to take them. Refer all parties to us you can. Our desire is to take up the Avery mortgage as soon as we can turn the cattle, and release your land at once. We have since July 1 increased our paid in capital to nearly $150,000, which was fortunate, as it enabled us to contract the cattle without additional embarrassment. I write this because it is due to you to be informed of what has been done.

"Very truly yours,

"JOHN G. JAMES."

The objections to the evidence were stated as follows:

"Because they contain declarations after transaction by a party adversely interested to the bank, who is now giving testimony for himself, and they are irrelevant and impertinent and not part of the *res gestœ*. Said letters are not binding on the bank, because the witness James stated that he did not write them as president of the bank, and they do not appear to be signed by him as such president."

James stated that he was president of the bank when he wrote the letters.

We think that other evidence in the cause conclusively shows that it was the bank's business to which the letters related, and being written by the president of the bank, who negotiated the transactions, no good reason is apparent why they should not have been admitted over the objections of the defendant bank. Every material fact which they have any tendency to prove was, we think, conclusively proved by other evidence admitted without objection.

The plaintiff proved by the witness Wilson that General James, in consideration of the bank getting the cattle, agreed to pay off all these debts with which the cattle were encumbered, and that General James was the bank's attorney, after proving by John G. James that as president of the Panhandle National Bank he appointed F. W. James its attorney to look after said cattle and transact its business in reference to said cattle.

The defendant objected to the evidence "because an attorney could not bind the bank, and because it appears to be the representation and agreements made by the attorney of the bank, one General James. That said attorney had no authority to make any contract or promise or in anywise

bind the bank by any agreements made by and between himself and the said Wilson and Stevens."

The evidence does not indicate that General James was acting as an attorney at law, but that he was sent to the range of the cattle by the president of the bank as the agent of the bank to collect together and receive the cattle for the bank from Stevens. It appears that it was then, when he was receiving the cattle for the bank, that he made the statement objected to. The evidence as it appears in the bill of exceptions and in the statement of facts is that "in consideration of the bank getting these cattle General James agreed to pay off all these debts."

It does not very clearly appear that this evidence ought to have been admitted. It appears to be an individual promise by General James that he would pay the debt. As such it could have no relevancy to this case. As it very clearly otherwise appears that the bank was obligated to pay the debt, the evidence appears to us to have been utterly immaterial, and if taken literally could not have influenced the verdict of the jury.

We find no error in the proceedings for which we think the judgment ought to be reversed, and it is therefore affirmed.

*Affirmed.*

Delivered November 14, 1890.