THOMAS REGIONAL DIRECTORY CO., INC., a Division of Thomas Publishing Company, L.L.C., Appellant,

v.

DRAGON PRODUCTS, LTD., Appellee.

No. 09–05–176 CV.

Court of Appeals of Texas, Beaumont.

Submitted March 9, 2006.

Decided June 15, 2006.

Roger McCabe, J. Matthew Marchak, Mehaffy Weber, Beaumont, for appellant.

J. Hoke Peacock, II, Nathan M. Brandimarte, Christopher A. McKinney, Orgain, Bell & Tucker, Beaumont, for appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

This case involves a dispute over the validity of a series of twelve advertising contracts executed by an agent. Although the jury found the agent had apparent authority, the trial court granted judgment notwithstanding the verdict. In two issues, Thomas Regional Directory Co., Inc.,

a Division of Thomas Publishing Company, L.L.C., ("Thomas") contends the trial court erred because a duty to ascertain the fact and scope of an agent's authority by direct inquiry to the principal is not an element of the doctrine of apparent authority, and the general partner's actions in cloaking the agent with apparent authority was not raised at trial. In two cross-points, Dragon Products, Ltd. ("Dragon") contends the trial court provided an erroneous jury instruction on apparent authority and challenges the factual sufficiency of the evidence supporting the finding on apparent authority. Because we find the trial court properly submitted the case to the jury and the jury's verdict is supported by the evidence, we hold the trial court erred in granting judgment notwithstanding the verdict. Accordingly, we reverse the judgment and remand the cause with instructions to the trial court to render judgment in accordance with the jury's verdict and to calculate prejudgment and postjudgment interest.

Thomas is an industrial publishing company that produces buying guides and internet services for industry. In December 2002, Rodney Lanning contacted one of Thomas's sales representatives, Josephine Griffo, about procuring marketing services for Dragon and its related entities. Lanning told Griffo that he had been hired as marketing manager for Dragon, that Dragon spent $800,000 annually on advertising, and that he was going to bring all of the advertising in-house. A series of contacts, sales calls, and meetings resulted in the execution, on January 24, 2003, February 13, 2003, and March 17, 2003, of contracts for print advertising in various regional directories published by Thomas, at a cost of $146,226.50 in staggered payments. Lanning signed the contracts on behalf of Dragon.[1] Over the next several months, Griffo continued a series of contacts with Lanning and other Dragon representatives while she worked on a sample online catalogue and website design.[2] In September 2003, after the regional directories had been printed and distributed and after Dragon had made payment on two of the contracts, Dragon's representatives notified Griffo that Lanning executed the contracts without authority and demanded that the payments be credited to the website development contract the parties were negotiating. When Griffo presented a proposed contract that did not include a credit, business relations between the parties ceased and litigation commenced.

Dragon filed a petition for declaratory judgment relief in which it sought a determination that any contracts between Thomas and Dragon regarding regional

---

1. Lanning testified that Griffo told him "these were not contracts or binding agreements." He understood they "were going to be held, that they were not going to be turned in." According to Lanning, "my signature was just a way of showing good faith and commitment on Dragon's part as far as the Dragon web site design." The purpose of the contracts was "to get her graphics department to start looking on designing a web site." The website design was a separate job with a $30,000 budget. No contract was ever signed for Thomas to create a website for Dragon.

2. Jennifer Byrd, an employee in the Beaumont facility of Dragon's general partner, worked on graphics and communicated directly with Griffo in February and March 2003. Lanning testified Byrd's work was prepared for the website. An e-mail from Byrd to Griffo referred to "Linecard, Brochure, and Print Ads" prepared by Byrd and sent to Griffo. Griffo testified this work was for the print regional directories, not the website. A series of e-mails from Griffo to Byrd one month later referred to attached "artwork for the print," "billboards for the cd-roms and Internet," and a "2 screen electronic brochure." These materials were prepared by David Bayless, at Griffo's expense.

directories were invalid. Dragon sought a refund of $8,864.10 it alleged had been mistakenly paid to Thomas. Thomas counterclaimed for breach of contract against Dragon and its general partner, The Modern Group GB–Sub, Inc. ("Modern"). Dragon and Modern filed unverified denials of authorized execution and pled affirmative defenses of fraud, alteration, and mutual mistake. Dragon and Modern filed a motion for summary judgment on the ground that Lanning lacked authority to sign contracts on behalf of Dragon. The trial court made a pre-trial ruling that Lanning lacked actual authority, but found a fact issue on apparent authority and set the case for trial. The trial court also denied Thomas's motion to open and close after Dragon asserted that Dragon had the burden of proof on the issues of actual and apparent authority. At trial, the court refused Dragon's requested issue on apparent authority and submitted an issue derived from the Texas Pattern Jury Charges. No issue was submitted on Modern's liability. The jury found Lanning acted with apparent authority as to all contracts, failed to find Dragon's noncompliance excused, found Thomas's damages to be $146,726.50, and found attorney's fees for both parties. The trial court granted Dragon's motion for judgment notwithstanding the verdict. In a letter to counsel, the trial court explained that "there is more than a scintilla of evidence to support the jury's finding," but ruled that precedent established by three intermediate appellate court opinions required that, when dealing with an agent, one must ascertain both the fact and scope of the agent's authority. The trial court explained that it granted judgment notwithstanding the verdict because it was undisputed that Griffo made no effort to determine the fact and scope of Lanning's authority.

■ The question presented to the jury asked if Lanning had the apparent authority to purchase marketing services and products from Thomas on the three dates on which contracts were signed. The trial court instructed the jury that

Rodney Lanning had "apparent authority" if Dragon Products:

1. Knowingly permitted Rodney Lanning to hold himself out as having authority; or
2. Through lack of ordinary care, bestowed on Rodney Lanning such indications of authority that would lead a reasonably prudent person to rely on the apparent existence of authority to his/her detriment.

Only the acts of Dragon Products may be considered in determining whether apparent authority exists.

Thomas contends the jury instruction is correct and the evidence supports the jury's finding for each element of apparent authority. The trial court based its instruction on the pattern jury charge instruction on authority in breach of contract litigation. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGE-BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 101.4 (2003). The comment to PJC 101.4 explains that apparent authority

arises if a principal either intentionally or negligently induces parties to believe that a person is the principal's agent even though the principal has conferred no authority on that person. *Roberts v. Capitol City Steel Co.*, 376 S.W.2d 771, 775 (Tex.Civ.App.-Austin 1964, writ ref'd n.r.e.). Apparent authority, which is based partly on estoppel, may arise from two sources: first, from the principal's knowingly allowing an agent to claim authority; and second, from the principal's negligently bestowing on the agent such indications of authority that a rea-

sonably prudent person is led to rely on the existence of that authority. *Ames v. Great Southern Bank,* 672 S.W.2d 447, 450 (Tex.1984); *Rourke v. Garza,* 530 S.W.2d 794, 802 (Tex.1975); *Hall v. F.A. Halamicek Enterprises,* 669 S.W.2d 368, 375 (Tex.App.-Corpus Christi 1984, no writ); *Sorenson v. Shupe Bros. Co.,* 517 S.W.2d 861, 864 (Tex.Civ.App.-Amarillo 1974, no writ).

Because apparent authority is based on estoppel, the principal's conduct must be that which would lead a reasonably prudent person to believe that authority exists. *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 778–79 (Tex.1974); *Campbell v. C.D. Payne & Geldermann Securities, Inc.,* 894 S.W.2d 411, 422 (Tex. App.-Amarillo 1995, writ denied).

COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGE-BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 101.4 cmt. (2003).

Dragon contends Texas law has required for over a century the exercise of diligence and discretion by a party dealing with an agent. Dragon also contends Thomas fails to distinguish those cases which recognize the rule that a party dealing with an agent has the burden to ascertain the existence and scope of the agent's authority at that party's own risk and peril. Dragon contends the trial court erred in failing to instruct the jury that Lanning's apparent authority to sign marketing contracts must be predicated on a finding that Thomas "ascertained both the fact and the scope of Rodney Lanning's authority[.]" Dragon also claims there is no evidence that Thomas exercised due diligence to ascertain the existence or scope of Lanning's authority,

and the trial court properly granted judgment notwithstanding the verdict for that reason. Dragon also argues that Thomas waived the element of diligence and discretion by objecting to its inclusion in the instruction, so the jury's verdict cannot stand and judgment must be rendered in favor of Dragon.[3]

Dragon overstates the significance of the proposition, stated in many cases where apparent authority is at issue, that a party dealing with an agent must ascertain the fact and scope of the agent's authority, and deals with an agent at its own risk. *See, e.g., Suarez v. Jordan,* 35 S.W.3d 268, 273 (Tex.App.-Houston [14th Dist.] 2000, no pet.)

While a failure to inquire under some circumstances may be evidence that the reliance was unreasonable because diligence and discretion were not exercised, there is no separate element of apparent authority that requires proof the relying party ascertained the fact and scope of the agent's authority. *See generally Baptist Memorial Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 n. 2, 949 (Tex.1998) (setting forth elements of ostensible agency, and noting as a practical matter there is no distinction from apparent authority). *See also Ames v. Great S. Bank,* 672 S.W.2d at 450; *Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 427 (Tex.1953). To require a relying party to prove it ascertained the fact and scope of authority would require proof of actual authority, not apparent authority. Apparent authority is based on estoppel, and is intended "to prevent injustice and protect those who have been misled." *See Baptist Memorial*

---

**3.** We note, however, at trial Dragon responded to Thomas's motion to open and close as follows:

"Dragon asserted in its pleadings a number of affirmative causes of action and defenses

for which it has the burden of proof at trial, including without limitation: ... 5. No actual or apparent authority on the part of Rodney Lanning...."

*Hosp. Sys. v. Sampson,* 969 S.W.2d at 948 n. 2, 949.

■ The focus of apparent agency is on the conduct of the principal, not the agent or the relying party. The principal's conduct must be such "as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise." *Chastain v. Cooper & Reed,* 257 S.W.2d at 427 (1953). Long-standing precedent establishes that the exercise of diligence and discretion does not necessarily require inquiry into the fact and scope of the agent's authority. For example, in *Chastain* the court found the evidence legally insufficient to establish apparent authority as to one relying party, but sufficient as to two others. *Id.* at 427–28. The former provided an oilfield Christmas tree in reliance on the agent's prior purchases of small supplies for the principal; the latter had previously provided the same bulldozer services to the principal through the agent. *Id.* There was no indication the principal was aware of the supplier's reliance, but its office manager had returned the bulldozers' invoice with a letter instructing them to present the bill to the agent and that the principal would see that it was paid. *Id.* The principal's acquiescence to a course of conduct provided the primary distinction between the two situations. *Id.* The Supreme Court also focused on the principal's conduct in a case that held the principal did not create the appearance of agent authority to accept a return in cancellation of indebtedness simply by permitting the agent to sell the principal's cash registers. *See Wichita Frozen Food Lockers v. National Cash Register Co.,* 142 Tex. 109, 176 S.W.2d 161 (1943).

■ Those cases in which the relying party is held to have failed to exercise reasonable diligence depend upon the conduct of the principal, not the relying party.

For example, in *Tompkins Mach. & Implement Co. v. Peter,* 84 Tex. 627, 19 S.W. 860 (1892), the principal and the third party had a pre-existing dispute over ten pulverizers. The principal sent its agent to the third party with strict instructions to collect the debt but not to compromise the claim. *Id.* 19 S.W. at 861. The agent disobeyed his instructions and accepted return of some of the machines in cancellation of the debt. *Id.* The doctrine of apparent authority did not apply because the principal did nothing to hold out its agent as having authority to do anything other than accept full payment. *Id.* Although Lanning acted as a *general* agent working exclusively for the Dragon entities, and entrusted with managing the companies' marketing, the principle Dragon sought to have included in the charge arises primarily in cases of *special* agency.

The general rule is, that one who deals with another, who claims to be the agent of a third person, but who has no written authority, without inquiry of the alleged principal, does so at his peril. When, however, a general agent is appointed, persons dealing with him in relation to the business of his principal are not affected by any secret instructions, limiting his authority, which have not come to their knowledge. *Railway Co. v. Hill,* 63 Tex. 381 [1885]. But, on the other hand, they must inquire in the proper quarter as to the instructions of a special agent; and, failing to do this, the principal is not bound for an act of his agent beyond the scope of his authority, in the absence of some proof of his holding the latter out as having power to do the particular act, or of ratification of the act after it is done. *Railroad Co. v. Ford,* 53 Tex. 364 [1880].

*Buzard v. Jolly,* 6 S.W. 422, 424 (Tex. 1887); *see also Collins & Douglas v. Cooper,* 65 Tex. 460 (1886).

Finally, we note that the Supreme Court affirmed the judgment in a suit on a promissory note in a case in which the trial court denied the appellant's request for an instruction much like the instruction requested by Dragon. *See Panhandle Nat'l Bank v. Emery*, 78 Tex. 498, 15 S.W. 23, 27 (1890). We conclude that the trial court properly instructed the jury on the applicable law on apparent authority. *See Ames v. Great S. Bank*, 672 S.W.2d at 450. Dragon's first cross-point is overruled.

Thomas contends the trial court erred in granting judgment for Dragon notwithstanding the jury's verdict in favor of Thomas on the question of Lanning's apparent authority to contract for marketing services for Dragon. The appellant contends there is evidence that Dragon knowingly permitted Lanning to hold himself out as having authority or, through lack of ordinary care, bestowed on Lanning such indications of authority that Griffo reasonably relied on the apparent existence of authority to execute the contracts. For this analysis, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807–08 (Tex.2005). The evidence is legally sufficient if it enables reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

█ Ronald Chilton testified he was a consultant for Dragon from September 2002 until April 2003, when he became Dragon's president. He left Dragon in October 2003. Chilton had worked with Lanning at their previous company and hired Lanning as a consultant in late 2002. On April 1, 2003, Chilton offered Lanning the position of "Advertising and Marketing Manager for the Modern Group, Ltd. and its subsidiaries, Crenshaw Enterprises and Modern, Ltd. ... reporting directly to the President of Dragon Products, Ltd." beginning "[o]n or before April 1, 2003." The duties described in the agreement include overseeing the operation and management of the advertising and marketing department. Chilton testified that before April 1, 2003, Lanning assisted in organizing trade shows, preparing a catalogue, and working on a website. Although Lanning signed the contracts before April 1, the jury heard testimony that prior to April 2003, Lanning provided more services to the company than those described by Chilton and there is no indication in the record that either Lanning's or Chilton's duties changed in April. The jury could have reasonably found that the men's status with the company changed from contractor to employee but that they performed the same duties for Dragon before that date.[4]

In early January 2003, Lanning met with Griffo in the offices Lanning shared with the company executives at Dragon's La Porte facility. Griffo obtained Lanning's business card: a Dragon Products business card that identified Lanning as marketing manager.[5] During this meet-

---

4. For instance, Lanning testified that while he worked as a consultant, his direct supervisor was "Ron Chilton, CEO of the company." Since Lanning converted to employee status on April 1, and Chilton did not become President of Dragon Products until sometime in April 2003, the jury could infer that Chilton was running the company before April 2003.

5. Dragon produced an April 2003 invoice for business cards for Lanning and others. Although Modern's Vice President, Casey Crenshaw, testified that he was not aware that Lanning had Dragon logo business cards before he became an employee, Griffo testified that in January she obtained a Dragon business card that identified Lanning as marketing manager, and that in April she obtained a

ing, Lanning explained that he wanted national coverage and gave her brochures on which to base her proposal. Lanning arranged a meeting on January 29, 2003. Griffo, Lanning, Colby Crenshaw, who runs Crenshaw Enterprises, Doyle Gould, President of Dragon Filtration and international sales manager for Dragon Products,[6] chief operating officer Doug Fierce, national sales manager Ed Loredo, and Lindsay King attended. Griffo's, Lanning's, and Gould's testimony differed over what transpired at this meeting. Griffo testified that they discussed at great length exactly what print advertising categories their departments wanted to market. She claimed the executives were choosing the ten categories in which to advertise. Griffo corroborated her testimony with a list of categories handwritten by Gould. Griffo also testified that Lanning had the first five executed contracts out on the conference room table during the meeting. The jury could reasonably believe Griffo's account of the meeting, just as they could disbelieve Gould's testimony that during this meeting he informed Griffo and Lanning that the authorization would have to come from the Crenshaw family.

Ronald Chilton first met Griffo in January 2003, in an encounter lasting less than two minutes. Chilton testified that during this meeting he told Griffo that they did not want any print advertising, that he and Lanning were just consultants, and that anything they did would have to be approved by the Crenshaws. This testimony was controverted by Griffo, who testified that before September 2003 Chilton never mentioned that Chilton and Lanning were only consultants or that they would need the Crenshaws' approval before signing any contracts. Chilton's written authorization to execute contracts and conduct business for Dragon pre-dated the meeting, and contradicts his statement.[7] The jury could have reasonably disbelieved Chilton's testimony. *See City of Keller v. Wilson,* 168 S.W.3d at 812.

Dragon contends the trial court properly granted judgment notwithstanding the verdict because there is no evidence that the officers or managers of the Modern Group GP–Sub, Inc. cloaked Lanning with any indicia of authority. Acting through Chilton, Dragon hired Rod Lanning as its marketing manager in November 2002. Lanning's responsibilities included overseeing Dragon's marketing and advertising operations from Dragon's La Porte facility. Dragon provided Lanning with an office in its La Porte manufacturing facility, furnished a large map that displayed the marketing area for which Lanning was responsible, equipped Lanning with a telephone routed through Dragon's switchboard, business cards, access to a computer, photocopier, and office supplies. In addition to making it appear that Lanning was an employee, Dragon situated Lanning where he appeared to have executive status. Lanning shared an office with Gould and Fierce. The same office was used by Ca-

---

new card that identified Lanning as director of marketing and communications.

**6.** Gould testified that his employment with Dragon commenced July 2002, and that he was a partial owner of Dragon Filtration until he sold his interest in the company to the Crenshaw family in November 2003.

**7.** A letter signed by Casey Crenshaw as Vice President states:

This letter will confirm that The Modern Group, Ltd, the owner of Dragon Products, Ltd has appointed Mr. Ronald W. Chilton as its *"Authorized Agent"* for executing all legal documents and conducting all business related to Dragon Products Ltd.

General Partner:

The Modern Group G.P., Inc.

sey Crenshaw and Will Crenshaw when they were in La Porte. As early as January 2003, the executives of Dragon and its affiliated entities observed Lanning's activities with Griffo. Chilton and Gould participated in some of the other meetings between Lanning and Griffo. Griffo testified that Gould sat in on many of their conversations, that he was totally aware of the marketing programs, and that she told Gould about the contracts around the end of January.

Although Lanning testified he did not have the authority to make expenditures, the record contains evidence controverting his assertion. The invoice for business cards is signed by "R. Lanning Modern Group 5/03/03." The Thomas invoices in the record were similarly signed "R. Lanning 6/28/03."[8] Lanning testified that his signature merely signified that the bill crossed his desk, not that he approved their payment. The appearance of his signature on invoices is circumstantial evidence that tends to show that in the course of his employment Dragon allowed Lanning to approve invoices for payment.

It was undisputed that Lanning was doing Dragon's marketing, not self-dealing. Dragon contends the record contains no evidence that a marketing consultant typically has the authority to sign contracts on behalf of a company. Griffo testified the Dragon business card she obtained in January 2003 stated that Lanning's title was Marketing Manager. Griffo testified that in her first meeting she asked if her contact was the person responsible for making the marketing program decisions, and in twenty-five years there had never been another occasion where the authority of her customer became an issue. According to Griffo, there was nothing unusual about the execution of the contracts. When they signed the contracts, Lanning took Griffo over to the bookkeeper so Griffo could explain the billing process to her. As the appellee notes in its brief, Lanning's acts do not establish apparent authority. Nonetheless, the record clearly demonstrates that Lanning was not hiding his actions from his employers. That Lanning was openly executing contracts at Dragon's offices and arranging for their payment through what appear to be normal channels is some evidence that Dragon was aware that he was doing so.

Dragon conferred on Lanning a title that indicated he managed the companies' marketing, installed him in offices that made him appear to be the marketing manager, and allowed him to negotiate the contracts openly in the presence of its executives. Other executives participated in the meetings under circumstances where Lanning was obviously negotiating a contract for marketing services. Lanning gathered the executives of the several companies for a meeting in which those executives made decisions about allocating their print advertising. Although Dragon's witnesses testified that they informed Griffo of Lanning's lack of authority, the jury could disbelieve their testimony and instead believe that Dragon knowingly allowed Lanning to hold himself out as having authority. The jury could also believe that, through lack of ordinary care, Dragon bestowed on Lanning such indications of authority that Griffo reasonably relied on the apparent existence of authority to execute the contracts. Because the jury's verdict is supported by some evidence of apparent authority, the trial court erred in granting judgment notwithstanding the verdict. Issue one is sustained.

---

8. At least one of the printed invoices states: "This contract was authorized by Rod Lanning/Mktg Mgr."

In its second cross-point, Dragon contends the evidence supporting the jury's finding of apparent authority is against the great weight and preponderance of the evidence. When the trial court renders an erroneous judgment notwithstanding the verdict, the appellate court must reverse the trial court's judgment and enter judgment on the verdict unless the appellee presents a cross-point sufficient to vitiate the jury's verdict or to prevent affirming the judgment had one been entered on the verdict. TEX.R.APP. P. 38.2(b)(1). Such grounds include a challenge to the factual sufficiency of the evidence to support the verdict or one or more jury findings. *Id.* In reviewing a factual sufficiency point of error, we consider all of the evidence, and may set aside the verdict only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001).

Dragon contends it is undisputed that Lanning was not authorized to sign the contracts and that Dragon had no knowledge that he had done so. Although Lanning, Chilton and Casey Crenshaw testified that Lanning was not authorized to sign contracts, there was testimony that Lanning did sign the contracts and arrange for them to be billed through Dragon, that he openly displayed the contracts at the meeting where the executives chose advertising categories, and that two of the invoices were paid by Dragon. Although Thomas produced only circumstantial evidence to controvert the unequivocal testimony of Dragon's witnesses, the jury could have determined that Dragon's witnesses were interested in the outcome of the case and not credible. Furthermore, by Dragon's own reckoning it was aware of the contracts in July, at a time when several of the contracts could still be cancelled; however, Griffo testified Dragon did not challenge Lanning's authority until September.

Griffo admitted Lanning told her "all along" that he was having trouble getting the website design approved. Dragon contends this admission means Thomas either knew or should have known of the limitations on Lanning's authority. At the least, Dragon argues, Griffo did not exercise diligence and discretion in discerning the fact and scope of Lanning's authority. While this is some evidence that Griffo was aware that Lanning's authority was not unlimited, Thomas presented an explanation for the sequence of events surrounding the website development contract. Griffo testified there were meetings about the website after February 13, 2003, and people were not really sure what they wanted. In February, a Dragon employee worked on the artwork, then Griffo brought in outside graphics assistance in March. Griffo presented at least three proposals between February and April. Thus, there were problems involved in creating the website that did not occur with the print marketing and Lanning's authority to contract would not be necessarily suspect to a person acting with reasonable prudence.

Dragon contends Griffo's testimony was contradicted by her statement in deposition that she never talked to anyone at Dragon about the contracts. She explained that her answers in deposition and at trial referred to her actions at different times. The jury, not having access to her deposition, could have believed that her responses had been taken out of context. Lanning was also impeached with his deposition testimony and the jury could have found Griffo to be the more credible witness. We hold the jury's verdict is not against the overwhelming weight and preponderance of the evidence. Dragon's second cross-point is overruled.

**434**

In its prayer, Thomas requests a rendition of judgment against both Dragon and Modern. Thomas neither requested submission of a jury question on Modern's liability nor presented argument and authorities on the issue in its brief to this Court. *See* TEX.R. CIV. P. 279; TEX.R.APP. P. 38.1(h). The issue is waived.

Although they do not address the issue in their briefs, the parties disputed the correct rate of prejudgment and post-judgment interest. We remand the case in the interest of justice so that the trial court may have the opportunity to determine the applicable rate of interest.

We hold the trial court erred in granting judgment notwithstanding the verdict and that the jury's verdict is not against the great weight and preponderance of the evidence. Accordingly, we reverse the judgment and remand the cause with instructions to the trial court to render judgment for Thomas Regional Directory Co., Inc., a Division of Thomas Publishing Company, L.L.C., in the amount of $146,226.50 plus attorney's fees and costs in accordance with the jury's verdict, and to calculate prejudgment and post-judgment interest.

REVERSED AND REMANDED.