

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00175-CV

_____

HOF Partners LLC, Appellant

V.

Nautilus Insurance Company, Appellee

---

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-333302-22

---

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

This is an appeal from a summary judgment in a dispute related to a commercial insurance policy. Appellant HOF Partners LLC, through its retail agent Summit Insurance Group, LLC, applied for and obtained property and casualty insurance from Appellee Nautilus Insurance Company. Under the parties' agency billing plan, Summit was responsible for collecting the premiums from HOF and transmitting them to Nautilus via its broker. However, although HOF timely made its premium payments to Summit, Summit failed to forward them to Nautilus, who then, unbeknownst to HOF, canceled the policy and, based upon this cancellation, subsequently refused to cover a loss claimed by HOF. After Nautilus denied HOF's claim, HOF filed suit, and the parties filed cross-motions for summary judgment regarding, among other things, the crucial question of whether Summit was Nautilus's statutory agent for purposes of collecting premiums.

The trial court implicitly held that Summit was not Nautilus's statutory agent and entered orders (1) denying HOF's motions for partial summary judgment, (2) granting Nautilus's summary judgment motion, and (3) severing HOF's claims against Nautilus from the other pending claims in the lawsuit.[1] Because we conclude

---

[1]As more fully discussed below, HOF sued several other parties besides Nautilus. After granting Nautilus's summary judgment motion, the trial court severed HOF's claims against Nautilus, thereby making the summary judgment order final and appealable. *See* Tex. Civ. Prac. & Rem. Code § 51.012; *Indus. Specialists, L.L.C. v. Blanchard Refin. Co.*, 652 S.W.3d 11, 13 (Tex. 2022).

that a genuine issue of material fact exists regarding Summit's statutory agency, we will reverse and remand.

## I. BACKGROUND

HOF owns and operates several commercial buildings in Arlington, Texas. Prior to 2018, HOF engaged Summit to procure property and casualty insurance for its Arlington properties. HOF had an existing business relationship with Summit and had regularly dealt with two of its agents, Craig Belmont and David Fowler, for the procurement of insurance.

In early 2018, Fowler completed an insurance application for HOF, which he then submitted to Nautilus's surplus lines agent Breckenridge Insurance Services.[2] The standard-form application allowed HOF to select either a "direct" or "agency" billing plan. HOF selected "agency," meaning that it would make its premium payments to Summit, the retail agent, who would then transmit them to Nautilus (or to Breckenridge on Nautilus's behalf).[3]

---

[2]Because Nautilus is not licensed to sell insurance in Texas, it is considered a "surplus lines insurer." *See* Tex. Ins. Code Ann. § 981.002(4). Under the Texas Insurance Code, only a Texas-licensed surplus lines agent can procure a surplus lines policy from a registered surplus lines insurer such as Nautilus. *See id.* §§ 981.002(8), 981.202. As Nautilus's surplus lines agent, Breckenridge received insurance applications from Texas-based applicants on Nautilus's behalf.

[3]Nautilus's corporate representative confirmed that under the proposed "payment plan," Summit would be billed for the premiums and would be responsible for both collecting them from HOF and transmitting them to Breckenridge. Breckenridge, in turn, would forward them to Nautilus. HOF's principal Jeffrey Ho

After reviewing HOF's file, Breckenridge determined that it did not have the underwriting authority to provide an insurance quote, so the application was submitted to a Nautilus underwriter for review and approval. After reviewing the application, which clearly indicated the "agency" billing plan, Nautilus approved it and authorized Breckenridge to issue a quote.

Ultimately, HOF agreed to purchase the Nautilus policy on the condition that the premiums could be paid in installments, an option Fowler had previously offered to HOF. An agreement was reached whereby HOF would pay the premiums in two installments, one in early March 2018 and the other in late March 2018. On March 2, 2018, a Summit representative picked up the first of two payments directly from HOF's office. After Summit received the first payment, Fowler sent an email to Breckenridge requesting that the policy be bound and received a binder confirmation reflecting that coverage was in effect as of March 6, 2018. Subsequently, HOF made its second payment to Summit and received a copy of the Nautilus insurance policy. Thus, HOF believed that all premiums had been paid and the policy was in place.

However, while Summit had received both premium payments from HOF, it had failed to forward them to Breckenridge. On April 20, 2018, Fowler received an email notifying him that Breckenridge had not received the premium payment due March 26, 2018, and advising him that the policy would be cancelled if the payment

confirmed that this was his understanding of how the payment of the insurance premiums would be handled.

4

was not made within ten days. HOF was not notified about this issue.[4] On April 30, 2018, Breckenridge called Summit and left a message instructing it to pay the balance owed, but Summit did not do so.

On May 8, 2018, Fowler received a notice of cancellation of HOF's policy from Breckenridge via email.[5] No one at Summit alerted HOF about the policy's cancellation.[6]

On June 4, 2018, Breckenridge forwarded to Summit Nautilus's "Endorsement #1" to HOF's policy documenting that effective May 21, 2018, "the policy is cancelled due to non-payment of premium." The endorsement reflected that the cancellation was "[i]n consideration of a return premium of $9,104." The same day,

---

[4]Fowler testified that he physically handed Belmont a copy of the April 20 email and that Belmont said "he was going to take care of it." But Fowler never informed HOF about the email, nor did he inform Breckenridge that Summit had received the premium payments from HOF or that Belmont "was going to take care of" forwarding the premiums to Breckenridge.

[5]Breckenridge also sent HOF a notice of cancellation via certified mail, but the mailing was returned to Breckenridge and marked "Return to Sender[,] Unclaimed." The post office tracking system reflects that it was "refused" on May 10, 2018.

[6]Fowler testified that he told Belmont about the notice and "probably" gave him a copy of it and that Belmont once again said "he was going to take care of it." Fowler never notified HOF of the policy's cancellation and never reached out to Breckenridge to discuss it.

Breckenridge sent Summit an invoice requesting that $4,012.45—the premium owed for the time the policy was in effect before cancellation[7]—be paid by June 24, 2018.

On June 5, 2018, a hailstorm struck the Arlington area, severely damaging HOF's buildings. An inspection revealed roof damage and water damage to interior units.

On June 12, 2018, Summit sent Breckenridge a check in the amount of $6,711.33, which included the notation "Account Current" in the memo line. According to Nautilus's records, $4,012.45 of this check—the amount of prorated premium reflected in Breckenridge's June 4 invoice—was "paid toward [HOF's] policy," and the balance of the check was for premiums on policies for other entities unrelated to HOF.

On August 6, 2018, Nautilus received HOF's claim for the damage from the June hailstorm. After receiving HOF's claim, Nautilus began reviewing the cancellation of HOF's policy. During its investigation, Nautilus discovered that HOF had made premium payments to Summit and confirmed that Breckenridge had

---

[7]Nautilus's representative explained that "when calculating prorated amounts for partial time periods" of coverage after a policy is cancelled, the prorated premium is calculated using a "short rate factor," which can be calculated in three different ways. When termination is "due to the insured," Nautilus often employs a "short rate factor" that adds a penalty to the prorated premium amount "to recoup some of the additional costs associated with handling the policy." While it seems likely that this method was used in calculating the outstanding balance reflected in the June 4 invoice, because Nautilus's contract with Breckenridge assigns the latter the responsibility for "determining the appropriate factor," Nautilus's representative could not state for certain which "short rate factor" was used.

received $4,012.45 from Summit on June 18, 2018, which had been applied toward HOF's policy.

After investigating HOF's claim and the policy's cancellation, Nautilus ultimately denied the claim in October 2018. Nautilus's denial letter explained that because the policy was cancelled for non-payment effective May 21, 2018, and the June 5 date of loss fell outside the truncated policy period, Nautilus had "no obligation[] to cover or indemnify [HOF's] claim."

HOF sued Nautilus, Belmont, Fowler, Summit, and Summit's successor Texas American Insurance. As relevant here, HOF alleged that Summit was Nautilus's statutory agent and that because Summit had received the premiums prior to the policy's cancellation, Nautilus had no basis to cancel the policy or to deny HOF's claim.[8] HOF also alleged that because Nautilus had accepted premiums from Summit after the policy's cancellation date, Nautilus had waived the right to claim that the policy had been forfeited for non-payment.

HOF filed two motions for partial summary judgment seeking determinations that Summit was an agent of Nautilus under Sections 4001.051 and 4001.052 of the Texas Insurance Code and that its insurance policy was in effect at the time of loss for

---

[8]HOF asserted several claims against Nautilus, including breach of contract, breach of the duty of good faith and fair dealing, and breach of certain statutory duties. Each of these claims hinges on whether Nautilus had a valid basis to cancel HOF's policy, which, in turn, depends on the antecedent question of whether Summit was Nautilus's statutory agent for the collection of premiums.

other reasons.[9]  Nautilus filed its own competing motion for summary judgment seeking a ruling that the policy had been cancelled before the loss occurred; that Summit was not Nautilus's agent; and that because HOF's claimed loss was not covered by the policy, its extra-contractual claims failed.  After a hearing, the trial court granted Nautilus's summary judgment motion and denied both of HOF's summary judgment motions.  After denying HOF's motion to reconsider, the trial court severed all of HOF's claims against Nautilus.  This appeal followed.

## II.  DISCUSSION

On appeal, HOF raises four issues: (1) Was Summit Nautilus's statutory agent? (2) Did Nautilus have a valid legal basis to cancel HOF's policy? (3) Does a genuine issue of material fact exist regarding HOF's estoppel and waiver-of-forfeiture claims? and (4) Is there a valid basis for HOF's claims against Nautilus?  Because issues one, two, and four are interrelated, we will address them together below.  We address HOF's third issue for the limited purpose of explaining why rendition of judgment is inappropriate.  *See* Tex. R. App. P. 43.3, 47.1.

---

[9]In addition to a partial summary judgment declaring that Summit was Nautilus's statutory agent, HOF requested the trial court to declare as a matter of law (1) that Nautilus failed to properly cancel the policy; (2) that Nautilus waived its right to claim forfeiture by accepting premiums after the policy's purported cancellation; and (3) that because Nautilus had received premiums, it was liable under Insurance Code Section 981.007 for any losses covered by the policy.

8

## A.  STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  When both parties move for summary judgment and the trial court grants one and denies the other, we determine all questions presented and render the judgment that the trial court should have rendered.  *Mid–Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007).  When, as here, the trial court's order granting summary judgment does not specify the grounds relied upon, we must affirm the summary judgment if any of the summary judgment grounds are meritorious.  *See FM Props Op. Co. v. City of Austin*, 22 S.W.3d 868, 873–74 (Tex. 2000).

## B.  STATUTORY AGENCY

The crux of this dispute is whether HOF's premium payments to Summit can be characterized as payments to Nautilus itself.  In other words, is HOF's payment to Summit as good as payment to Nautilus?  HOF asserts that the answer to this question is "yes" because Summit was Nautilus's statutory agent.

HOF grounds its argument for Summit's statutory agency in the language of Sections 4001.051 and 4001.052 of the Texas Insurance Code.  *See* Tex. Ins. Code. Ann. §§ 4001.051–.052.  But Nautilus contends that these statutory provisions do not apply to surplus lines insurers like itself and that even if they do apply, Summit does

9

not meet the statutory requirements of an "agent." *See id.* § 4001.003(1). Thus, as a threshold matter, we must determine whether these statutes apply to Nautilus.

**1. Sections 4001.051 and 4001.052 Apply to Nautilus**

Section 4001.051 of the Texas Insurance Code sets forth a laundry list of conduct that constitutes acting as an "agent of [an] insurer." *See generally* Tex. Ins. Code. Ann. § 4001.051. The statute provides, in relevant part, as follows:

> (b) Regardless of whether the act is done at the request of or by the employment of an insurer, broker, or other person, a person is the agent of the insurer for which the act is done or risk is taken for purposes of the liabilities, duties, requirements, and penalties provided by this title or Chapter 21 if the person:
>
> > (1) solicits insurance on behalf of the insurer;
> >
> > (2) receives or transmits other than on the person's own behalf an application for insurance or an insurance policy to or from the insurer;
> >
> > . . . .
> >
> > (4) receives or transmits an insurance policy of the insurer;
> >
> > . . . .
> >
> > (6) receives, collects, or transmits an insurance premium; [or]
> >
> > . . . .
> >
> > (8) takes any other action in the making or consummation of an insurance contract for or with the insurer other than on the person's own behalf . . . .

*Id.* § 4001.051(b)(1)–(2), (4), (6), (8).

While Section 4001.051 creates a limited statutory agency "'for the purposes of the liabilities, duties, requirements, and penalties of' specific statutes," *Westview Drive*

10

*Invs., LLC v. Landmark Amer. Ins. Co.*, 522 S.W.3d 583, 604 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (quoting Tex. Ins. Code § 4001.051(b)), Section 4001.052 creates a much broader type of agency. Specifically, this statute provides that

> [a] person who solicits an application for life, accident, or health insurance or property or casualty insurance is considered the agent of the insurer issuing a policy on the application and not the agent of the insured in any controversy between the insurer and the insured, the insured's beneficiary, or the insured's dependents.

Tex. Ins. Code Ann. § 4001.052(a). Thus, under Section 4001.052, if a person[10] solicits an insurance application and an insurer places an insurance policy based upon that application, then that person is treated as the "agent of the insurer" and "not the agent of the insured" in any dispute arising between the two. *See id.*

Nautilus does not dispute that Summit engaged in certain of the activities enumerated in Section 4001.051 or that Summit solicited the application upon which Nautilus issued HOF's insurance policy as contemplated by Section 4001.052. Rather, as noted above, Nautilus argues that Sections 4001.051 and 4001.052 do not apply to surplus lines carriers such as itself. We disagree.

Nautilus's primary argument for the inapplicability of these statutes is a textual one. Both Section 4001.051 and Section 4001.052 describe circumstances under which a person will be treated as the agent of an "insurer." Tex. Ins. Code Ann.

---

[10]For purposes of Chapter 4001, "'[p]erson' means an individual, partnership, corporation, or depository institution." Tex. Ins. Code Ann. § 4001.003(8).

11

§§ 4001.051–.052.  For purposes of Chapter 4001, "insurer" is defined as "an insurance company or insurance carrier *regulated by the department.*"  *Id.* § 4001.003(6) (emphasis added).  Nautilus contends that, as a surplus lines insurer, it is not "regulated" by the Texas Department of Insurance (the Department) and therefore does not constitute an "insurer" for purposes of Sections 4001.051 and 4001.052.  Thus, the question of the statutes' applicability turns on the meaning of the word "regulated" as that term is used in the Insurance Code.

We review issues of statutory construction de novo.  *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (citing *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)).  "Our objective in construing a statute is to give effect to the Legislature's intent, which requires us to first look to the statute's plain language."  *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (quoting *Lippincott*, 462 S.W.3d at 509).  If the statute's language is unambiguous, we interpret it according to its plain meaning.  *Id.*  "We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted."  *Lippincott*, 462 S.W.3d at 509.

Because the Insurance Code does not define the term "regulated," we must apply the word's "common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result."  *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).  "When determining a statutory term's common, ordinary meaning, we typically consult

dictionaries." *City of Fort Worth v. Pridgen*, 653 S.W.3d 176, 183 (Tex. 2022) (citing *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011)); *accord Rodriguez*, 547 S.W.3d at 838.

Black's Law Dictionary defines "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules" and "regulation" as "[c]ontrol over something by rule or restriction." *Regulate*, *Regulation*, Black's Law Dictionary (11th ed. 2019). Similarly, Webster's defines "regulate" as "to govern or direct according to rule"; "to bring under the control of law or constituted authority"; or "to make regulations for or concerning." *Regulate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/regulate (last visited April 19, 2023). And Webster's definitions for "regulation" include "an authoritative rule dealing with details or procedure" and "a rule or order issued by an executive authority or regulatory agency of a government and having the force of law." *Regulation*, *id.*

These dictionary definitions make clear that to be "regulated" is to be subject to rules or restrictions. Accordingly, we conclude that an entity that is subject to rules or restrictions promulgated or executed by a government agency is "regulated" by that agency. More to the point, because surplus lines insurers are subject to certain rules and restrictions set forth in the Insurance Code and the Department is tasked with enforcing these rules and restrictions, surplus lines insurers are "regulated by the [D]epartment." *See* Tex. Ins. Code § 4001.003(6).

The Insurance Code clearly reflects the Legislature's intent for the Department to regulate surplus lines insurers. Indeed, the Insurance Code contains an entire

13

chapter—Chapter 981—devoted to their regulation and taxation. *See generally* Tex. Ins. Code Ann. §§ 981.001–.223; *see also R&M Mixed Beverages Consultants, Inc. v. Safe Harbor Benefits, Inc.*, 578 S.W.3d 218, 239 (Tex. App.—El Paso 2019, no pet.) (recognizing in parenthetical that "the purpose of Chapter 981 [of the Insurance Code] is to regulate and tax surplus lines insurance carriers" (citing Tex. Ins. Code § 981.001(c)); *but see Nautilus Ins. Co. v. Nicky & Claire's Daycare, Inc.*, 630 F. Supp. 2d 727, 732 n.2 (W.D. Tex. 2009) ("The [Surplus Lines Act] requires surplus lines insurers and surplus lines agents to comply with certain requirements in order to protect the insured, since surplus lines insurers are not regulated by the State of Texas.").[11] As the Code itself states in describing the purpose of Chapter 981:

> (a) An insurance transaction that is entered into by a resident of this state with an eligible surplus lines insurer . . . is a matter of public interest.
>
> (b) The transaction of surplus lines insurance is a subject of concern and it is necessary to provide for *the regulation, taxation, supervision, and control* of these transactions and the practices and matters related to these transactions by:

---

[11]Nautilus attempts to characterize the quoted language from the district court's opinion in *Nicky & Claire's Daycare* as a clear pronouncement that surplus lines insurers are not "regulated" by the Department. However, the *Nicky & Claire's Daycare* court clearly recognized that the Surplus Lines Act obliges surplus lines insurers "to comply with certain requirements." 630 F. Supp. 2d at 732 n.2. Thus, notwithstanding the quoted language that "surplus lines insurers are not regulated by the State of Texas," the district court's statement as a whole is consistent with our conclusion that surplus lines insurers are "regulated" under the term's common, ordinary meaning set forth above.

(1) requiring appropriate *standards and reports* concerning the placement of surplus lines insurance;

(2) imposing *requirements* necessary to make *regulation and control of surplus lines insurance* reasonably complete and effective;

(3) providing orderly access to eligible surplus lines insurers;

. . . .

(c) To *regulate and tax* surplus lines insurance placed in accordance with this chapter . . . , this chapter provides an orderly method for each person whose home state is this state for a particular transaction to effect insurance with eligible surplus lines insurers through qualified, licensed, and supervised surplus lines agents in this state, if coverage is not available from authorized and regulated insurers engaged in business in this state, under reasonable and practical safeguards.

Tex. Ins. Code Ann. § 981.001(a)–(c) (emphasis added). In accordance with this stated purpose, the Code sets forth requirements that a surplus lines insurer must satisfy to be eligible to do business in Texas, including providing the Department's commissioner with proof of the insurer's "authorization to engage in the business of insurance" in its home state. *Id.* §§ 981.004(a), 981.051(a), (c).

Further, the Code expressly authorizes the Department's commissioner to adopt rules to implement Chapter 981 or to satisfy federal laws or regulations. *Id.* § 981.009. The commissioner has exercised this authority by adopting "rules applicable to *licensing, regulation, and supervision of* surplus lines agents and *surplus lines insurers* and transactions." 28 Tex. Admin. Code § 15.1(b) (2018) (Tex. Dep't of Ins., Evaluation Requirements for Surplus Lines Insurance Coverage) (emphasis added).

15

Notably, in 2018 the commissioner proposed amended regulations for surplus lines insurers. 43 Tex. Reg. 8455 (2018) (to be codified at 28 Tex. Admin. Code §§ 15.1–15.301) (Tex. Dep't of Ins., Surplus Lines Insurance). During the public notice-and-comment period, one commenter suggested adding new rules requiring surplus lines insurers, among other things, to provide the Department with "a list of currently used and proposed Texas surplus lines agents" and "any other information requested by the [c]ommissioner to verify compliance with . . . Chapter 981." *Id.* at 8468–69. The Department rejected this suggestion, explaining that it "would add costs to the *regulated parties.*" *Id.* at 8469 (emphasis added). Thus, the Department itself has recognized that it regulates surplus lines insurers.

As a last redoubt on the applicability issue, Nautilus argues that even if Chapter 4001's definition of "insurer" is conceivably broad enough to include surplus lines insurers, such an interpretation of the statute is proscribed by the principles of statutory construction—specifically, (1) the requirement that we give effect to the Legislature's intent and (2) the prohibition against interpreting a statute in a manner that renders any part of it meaningless or superfluous. *See, e.g., Tex. Health Harris Methodist Hosp. Fort Worth v. Featherly,* 648 S.W.3d 556, 567–68 (Tex. App.—Fort Worth 2022, pets. denied). However, Nautilus's arguments are unpersuasive.

Nautilus asserts that a determination that Chapter 4001 applies to statutory lines insurers would be contrary to the Legislature's intent because while Section 4001.002—the chapter's "Applicability" section—clearly states that Chapter 4001

16

applies to surplus lines *agents*,[12] it makes no reference to surplus lines *insurers*. *See* Tex. Ins. Code Ann. § 4001.002(a)(4). Nautilus's argument ignores the focus of Chapter 4001, which is entitled "Agent Licensing in General." Every "person" listed in Section 4001.002(a) is an agent or similar professional such as an adjuster or a third-party administrator; no insurers are included. *See id.* §4001.002(a)(1)–(8). Thus, the absence of any reference to surplus lines insurers is unremarkable and is hardly indicative of the Legislature's intent to exclude them from Chapter 4001's scope. If anything, the Legislature's specific inclusion of surplus lines agents in Chapter 4001's "Applicability" section suggests that it intended Section 4001.003(6)'s definition of "insurer" to encompass surplus lines insurers. *See id.* §§ 4001.002(a)(4), 4001.003(6).

Nautilus also contends that applying Sections 4001.051 and 4001.052 to surplus lines insurers would conflict with the Legislature's intent as expressed in Section 981.007 and would render this section meaningless or superfluous. Section 981.007 specifies that if a surplus lines agent has received the premium for a particular policy and "a coverage question between the eligible surplus lines insurer and the insured arises regarding the assumed risk," then "the insurer is considered to have received the premium due for that coverage." *Id.* § 981.007(a)–(b). In other words, Section 981.007 provides that payment to a surplus lines insurer's designated surplus lines

---

[12]The statute provides, in relevant part, that Chapter 4001 applies to "each person licensed under . . . Subchapter E, Chapter 981." Tex. Ins. Code Ann. § 4001.002(a)(4).

17

agent is tantamount to payment to the surplus lines insurer itself. According to Nautilus, this is the "only . . . instance in which a surplus lines insurer 'is considered to have received the premium due for . . . coverage.'" But that is not what the statute says. Section 981.007 addresses one particular situation in which payment to a surplus lines insurer's agent constitutes payment to the insurer itself, but it does not preclude others. Indeed, Section 981.007 is silent regarding the crucial issue in this case— whether a premium payment to a retail agent under an agency billing plan constitutes payment to the surplus lines insurer who authorized and approved the billing plan. Because—as we will discuss in greater detail below—a surplus lines insurer may have other agents besides its designated surplus lines agent, applying Sections 4001.051 and 4001.052 to surplus lines insurers would not render Section 981.007 meaningless or superfluous.

In sum, having concluded that surplus lines insurers are "regulated" by the Department and having satisfied ourselves that applying Sections 4001.051 and 4001.052 to surplus lines insurers does not conflict with the Legislature's intent or other provisions of the Insurance Code, we hold that surplus lines insurers are "insurers" for purposes of Chapter 4001 and that, therefore, Sections 4001.051 and 4001.052 apply to Nautilus. *See id.* § 4001.003(6).

**2. Nothing in the Insurance Code or Texas Law Disqualifies Summit from Being Nautilus's Statutory Agent**

Having concluded that Chapter 4001 applies to surplus lines insurers, we must now determine whether Summit qualifies as Nautilus's "agent" under Sections 4001.051 and 4001.052. Nautilus argues that even if Chapter 4001 applies, Summit does not qualify as its agent because (1) the Insurance Code precludes anyone other than Breckenridge—Nautilus's designated surplus lines agent—from being its statutory agent and (2) the record establishes as a matter of law that Summit had no authority to act on Nautilus's behalf. Neither of these arguments has merit.

**a. Nautilus may have more than one agent.**

Relying on Section 981.004, Nautilus asserts that Summit is statutorily barred from being Nautilus's agent. This statute provides that "[a]n eligible surplus lines insurer may provide surplus lines insurance only if . . . the insurance is placed through a surplus lines agent." *Id.* § 981.004(a). According to Nautilus, this provision requires surplus lines insurers to "conduct business" exclusively through a licensed surplus lines agent and therefore precludes them from having any agents other than their designated surplus lines agent. However, the statutory text does not support the existence of such a rule.

While Section 981.004 clearly requires surplus lines insurers to *place* insurance exclusively through a licensed surplus lines agent, the statute is silent regarding whether surplus lines insurers may have other agents for other purposes—such as the

collection of premiums. *See id.* It is one thing to require surplus lines insurers to place insurance through a licensed surplus lines agent, but it is quite another to prohibit them from having any other agents. Such a blanket prohibition cannot be found in the language of Section 981.004. S*ee id.* Moreover, interpreting the statute in the manner Nautilus suggests would lead to an absurd result in which surplus lines insurers could not be held liable for the actions of their adjusters or other professionals even if they committed torts while acting within the scope of their actual or apparent authority. *See Foundation Reserve Ins. Co. v. Wesson*, 447 S.W.2d 436, 439 (Tex. App.—Dallas 1969, writ ref'd) (rejecting appellant surplus lines insurer's argument that its broker could not be its agent for purposes of collecting premiums based on the Insurance Code's proscription against surplus lines insurers "doing business 'by or through any person or agent acting within [Texas]'" because appellant had authorized the broker to collect the premiums and therefore should not be allowed "to avoid its responsibility . . . on the ground that the law prohibited it from having such an agent"); *see also Johnson v. Essex Ins. Co.*, No. 04-00-00745-CV, 2002 WL 112561, at *10 (Tex. App.—San Antonio Jan. 30, 2002, no pet.) (mem. op., not designated for publication) (recognizing that insurance adjuster was surplus lines insurer's agent).

We therefore reject Nautilus's broad reading of Section 981.004 and conclude that the statute does not preclude a surplus lines insurer from having other agents in addition to its designated surplus lines agent.

**b. A fact issue exists regarding Summit's authority.**

Nautilus argues that even if Chapter 4001 applies to surplus lines insurers generally, Sections 4001.051 and 4001.052 do not apply here because Summit does not qualify as an "agent." Chapter 4001 defines "agent" as "a person who is an authorized agent of an insurer . . . and any other person who performs the acts of an agent, whether through an oral, written, electronic, or other form of communication, by soliciting, negotiating, procuring, or collecting a premium on an insurance or annuity contract . . . ." Tex. Ins. Code Ann. § 4001.003(1). Nautilus contends that because there is no evidence that it communicated with Summit or HOF regarding the policy, HOF cannot show that Summit had either actual or apparent authority to act on Nautilus's behalf and therefore cannot prove that Summit was Nautilus's "authorized agent" for purposes of Section 4001.003(1). *See id.* However, Texas agency law and the theories of actual and apparent authority are not as narrow as Nautilus portrays them.

An agency relationship cannot be presumed to exist. *Cmty. Health Sys. Pro. Servs. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017); *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.). "Rather, if the existence of an agency relationship or the extent of the authority conferred is at issue, the party making the allegation has the burden of proving it by a preponderance of the evidence." *Hansen*, 525 S.W.3d at 697 (citing *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007)). The question of agency is generally one of fact. *Novamerican Steel, Inc. v. Delta Brands,*

*Inc.*, 231 S.W.3d 499, 511 (Tex. App.—Dallas 2007, no pet.); *Horne v. Charter Nat'l Ins. Co.*, 614 S.W.2d 182, 184 (Tex. App.—Fort Worth 1981, writ ref'd n.r.e.). However, if the facts are uncontroverted or otherwise established, the existence of an agency relationship is a pure question of law. *First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.); *Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.—Dallas 1990, writ denied).

For an agency relationship to exist, the agent must be clothed with either actual or apparent authority. *See Protect Env't Services, Inc. v. Norco Corp.*, 403 S.W.3d 532, 540 (Tex. App.—El Paso 2013, pet. denied); *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex. App.—Dallas 2008, no pet.). "Actual and apparent authority are both created through conduct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority)." *Protect Env't Services, Inc.*, 403 S.W.3d at 540 (citing *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)).

Actual authority, which can be either express or implied, "usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *2616 S. Loop LLC v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Coker v. Cramer Fin. Group, Inc.*, 992 S.W.2d 586, 594 (Tex. App.—Texarkana 1999, no pet.)). Thus, while actual authority is generally based on the principal's communications with the agent, it "may be implied through the conduct of either of the parties or from the facts and

circumstances surrounding the transaction in question." *Protect Env't Services, Inc.*, 403 S.W.3d at 540 (citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549–50 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). Actual authority may be general, meaning that the agent is empowered to act in virtually any capacity to transact business on behalf of the principal, or "special," in which case the agent is merely authorized to conduct a particular transaction or to perform a specific task or series of tasks. *Armendariz v. Hudgens*, 618 S.W.3d 750, 759 (Tex. App.—El Paso 2020, no pet.).

> Apparent authority, which is based on estoppel, arises
>
> either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise.

*Gaines*, 235 S.W.3d at 182 (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "In other words, apparent authority arises when a principal intentionally or negligently induces parties to believe that a person is the principal's agent although the principal has not conferred any authority on that person." *Protect Env't Services, Inc.*, 403 S.W.3d at 540 (citing *Thomas Reg'l Directory Co. v. Dragon Prods., Ltd.*, 196 S.W.3d 424, 427 (Tex. App.—Beaumont 2006, pet. denied)). To establish apparent authority, a party must demonstrate: "(1) a reasonable belief in the agent's authority; (2) generated by some holding out or neglect of the principal; and (3) a justifiable reliance on the authority." *Id.* at 541 (citing *2616 S. Loop*, 201 S.W.3d at

23

356). "In determining whether apparent authority exists, '[a] court may consider only the conduct of the principal leading a third party to believe that the agent has authority . . . .'" *Id.* (quoting *2616 S. Loop*, 201 S.W.3d at 356).

Nautilus asserts that the lack of any evidence showing that it directly communicated with either HOF or Summit regarding the policy is fatal to HOF's claim that Summit was Nautilus's agent. But, as the authorities cited above demonstrate, this is not the case. Actual authority can be bestowed through a principal's "want of due care," and apparent authority can arise when a principal's "holding out or neglect" causes a third party to reasonably believe in and justifiably rely upon a supposed agent's authority. *2616 S. Loop*, 201 S.W.3d at 356. Thus, the lack of evidence that Nautilus communicated with either HOF or Summit does not necessarily prevent HOF from proving that Summit was Nautilus's agent.[13]

The record shows (1) that HOF's insurance application, which was prepared by Summit, clearly indicated an "agency" billing plan and (2) that this application was

---

[13]Nautilus compares this case to *Vela v. Catlin Specialty Ins. Co.*, 13-13-00475-CV, 2015 WL 1743455 (Tex. App.—Corpus Christi–Edinburg Apr. 16, 2015, pet. denied) (mem. op.), in which the court held that the appellant had failed to establish the existence of an agency relationship between his retail agent and his insurer, Catlin, because "the evidence show[ed] that Catlin had no direct contact with" the retail agent. *Id.* at *10. However, the present case is distinguishable. The *Vela* court noted that the lack of contact between Catlin and the retail agent indicated that the latter lacked actual or apparent authority and pointed out that the appellant had "produced no evidence to the contrary." *Id.* Here, unlike the appellant in *Vela*, HOF has presented "evidence to the contrary"—Nautilus's approval of the agency billing plan.

submitted to a Nautilus underwriter who reviewed and approved it.[14] The record also shows that both HOF and Nautilus agreed and understood that under the proposed payment plan, Summit would be responsible for collecting the premiums from HOF and transmitting them to Breckenridge, who, in turn, would forward them to Nautilus. The undisputed evidence of Nautilus's acquiescence to such a billing arrangement is sufficient to create a genuine issue of material fact regarding whether Summit had actual or apparent authority to collect the premiums on Nautilus's behalf.[15] *See Ins. Co. of N. Am.*, 981 S.W.2d at 672 ("Apparent authority arises through

---

[14]Nautilus makes much of the fact that it was HOF that selected the "agency" billing plan on its insurance application and that Nautilus provided no input regarding that decision. However, this is of no consequence. Because Nautilus acquiesced to this billing arrangement with full knowledge, a fact issue exists regarding Summit's authority to collect premiums on Nautilus's behalf. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998).

[15]As noted above, although the question of agency is generally one of fact, if the facts are uncontroverted or otherwise established, the existence of an agency relationship is a pure question of law. *See First Nat'l Acceptance Co.*, 187 S.W.3d at 714; *Ross*, 796 S.W.2d at 210. However, as one of our sister courts has recognized, there is a distinction between an appeal following trial and an appeal from a summary judgment in which the facts, though undisputed, may not be fully developed. *See Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 742 n.24 (Tex. App.—Texarkana 2012, pet. denied) (op. on reh'g). As in *Harding*, while many of the facts in this case are undisputed, multiple conclusions could be inferred from those facts. *See id.* Accordingly, we conclude that the agency question should be treated as one of fact, not one of law, and that, therefore, the appropriate remedy is to remand this matter for further proceedings rather than to render judgment on the agency question. *See* Tex. R. App. P. 43.2(c)–(d), 43.3; *Harding*, 365 S.W.3d at 742 n.24; *see also In re J.A.J.*, No. 04-14-00684-CV, 2014 WL 7444340, at *3 (Tex. App.—San Antonio Dec. 31, 2014, no pet.) (mem. op.) (recognizing appellate courts' "broad discretion" to remand a case for further proceedings rather than render judgment "when there is a

25

acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority."); *2616 S. Loop*, 201 S.W.3d at 356 (noting that actual authority may be conferred by "want of due care"); *see also Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) ("The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law."). At a minimum, a fact-finder could reasonably infer that by knowingly approving and participating in an insurance transaction providing for such a payment process, Nautilus caused HOF to reasonably believe that Summit had authority to collect the premiums on Nautilus's behalf and that HOF justifiably relied on that authority. *See Protect Env't Services, Inc.*, 403 S.W.3d at 541 (listing elements of apparent authority); *see also Bradford v. Tex. Health Harris Methodist Hosp.*, No. 02-20-00357-CV, 2021 WL 1800181, at *6 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.) (holding that because "the . . . summary-judgment evidence allowed a fact-finder to reasonably infer actual knowledge and find that fact in favor of [appellant]," the appellant had "raised a genuine issue of material fact").

## C. SUMMARY JUDGMENT IS NOT WARRANTED

Having determined that a genuine issue of material fact exists regarding the crucial question of whether Summit was Nautilus's statutory agent for purposes of

---

probability that a case has not been fully developed for any reason" (citing *In re J.E.H.*, 384 S.W.3d 864, 872 (Tex. App.—San Antonio 2012, no pet.))).

collecting premiums, we hold that the trial court correctly denied HOF's request for summary judgment on this issue but erred by granting Nautilus's summary judgment motion. *See Mann Frankfort*, 289 S.W.3d at 848. Whether HOF's policy was in effect at the time the loss occurred and whether Nautilus breached its statutory and contractual duties to HOF hinge on whether Nautilus's cancellation of the policy was proper, and the propriety of Nautilus's cancellation of the policy, in turn, depends—at least primarily—on whether Summit was Nautilus's statutory agent. Because a fact issue exists regarding the antecedent question of Summit's agency, the trial court's summary judgment dismissing all of HOF's claims against Nautilus was premature. *See Swonke v. First Colony Community Servs. Assoc.*, No. 14-09-00019-CV, 2010 WL 2361691, at *10–11 (Tex. App.—Houston [14th Dist.] June 15, 2010, pet. granted, judgm't vacated w.r.m.) (mem. op.) (holding that it would be premature to grant summary judgment on a dependent issue where "a fact issue exists as to [an] antecedent question").

As noted above,[16] besides a partial summary judgment declaring that Summit was Nautilus's statutory agent and that Nautilus failed to properly cancel the policy, HOF requested that the trial court declare as a matter of law that Nautilus had waived its right to claim forfeiture by accepting premiums after the policy's purported cancellation. *See, e.g., Home Benefit Ass'n of Brazos Cty. v. Catchings*, 38 S.W.2d 386, 387

---

[16] *See supra* note 9.

27

(Tex. App.—Austin 1931, writ ref'd) ("The acceptance of an overdue premium . . . by an insurance company . . . waives the right to forfeit the insurance under the terms of the policy . . . for nonpayment."). In its third appellate issue, HOF asks that we render judgment in its favor based on this legal theory. However, as Nautilus points out, the only premium payment it received from Summit was in satisfaction of a post-cancellation invoice for "the remaining outstanding premium that was due" for the period of time that the policy was in force before it was cancelled. HOF, relying on some crude mathematical calculations,[17] contends that the payment Nautilus received exceeded the earned premium amount for the truncated policy period—and would therefore necessarily be, at least in part, for post-cancellation coverage. But HOF's analysis fails to account for the "short rate factor" that Nautilus's representative testified is typically used to calculate the earned premium for a cancelled policy. Although Nautilus's representative testified that this "short rate factor" can be calculated three different ways, the record does not indicate which method was used here.[18] Thus, even assuming the validity of HOF's legal theory that Nautilus's post-

---

[17]HOF argues that because the $4,102.45 post-cancellation payment amounted to 31.6% of the total premiums for the 365-day policy period, this payment should have been worth approximately 115 days' worth of coverage, which is longer than the policy was actually in effect.

[18]As explained above, *see supra* note 7, because Nautilus's contract with Breckenridge assigns the latter the responsibility for "determining the appropriate factor," Nautilus's representative could not state for certain which "short rate factor" was used.

28

cancellation acceptance of an overpayment of an invoice for earned premiums would, in essence, reinstate the policy,[19] there is a fact issue concerning whether Nautilus actually received an overpayment. Accordingly, the trial court properly denied HOF's request for summary judgment on this issue. Because further proceedings on the overpayment question are necessary, to the extent HOF's third appellate issue requests that we render judgment in HOF's favor, it is hereby overruled. *See* Tex. R. App. P. 43.3.

## D. CONSOLIDATION IS APPROPRIATE

HOF's briefing makes clear that its appeal is intended to encompass not only the trial court's summary judgment order but also its severance order that made the summary judgment final and appealable. Thus, we must address this issue. *See* Tex. R. App. P. 47.1.

Texas trial courts have broad discretion regarding the severance and consolidation of cases, but that discretion is not unlimited. *See Pierce v. Reynolds*, 160 Tex. 198, 199–202, 329 S.W.2d 76, 77–78 (1959); *In re Stonebridge Life Ins. Co.*, 279 S.W.3d 360, 363 (Tex. App.—Austin 2008, orig. proceeding). As relevant here, "[i]t is

---

[19]Nautilus questions the validity of HOF's waiver-of-forfeiture theory and asserts that even if HOF could prove an overpayment of premiums, this would merely give HOF a claim against Breckenridge—who accepted the premium payment on Nautilus's behalf—for money had and received. *See Tri-State Chems., Inc., v. Western Organics, Inc.*, 83 S.W.3d 189, 194 (Tex. App.—Amarillo 2002, pet. denied). We need not reach this issue, however, and express no opinion regarding the legal merits of HOF's waiver-of-forfeiture theory. *See* Tex. R. App. P. 47.1.

29

an abuse of discretion for a trial court to deny consolidation when the cases seeking to be consolidated are 'so interwoven . . . as to involve the same facts and issues.'" *Raj v. Four Star Bus., Inc.*, No. 01-19-00284-CV, 2020 WL 2026585, at *3 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, no pet.) (mem. op.) (quoting *Stonebridge Life Ins. Co.*, 279 S.W.3d at 363).

Here, given the trial court's disposition of HOF's and Nautilus's summary judgment motions, it did not abuse its discretion by severing HOF's claims against Nautilus to make its summary judgment order final and appealable. However, having determined that the trial court erroneously granted Nautilus's motion for summary judgment and that further proceedings are necessary, we hold that upon remand, HOF's claims against Nautilus—which involve the same facts and issues and seek recovery for the same injury as HOF's claims against the other defendants named in its petition—should be re-consolidated with the pending lawsuit against these other defendants. *See Raj*, 2020 WL 2026585, at *3. Therefore, vacatur of the severance order is appropriate.

## III. CONCLUSION

Having determined that fact issues exist regarding (i) whether Summit was Nautilus's statutory agent—and thus with respect to the dependent issues of whether Nautilus had a valid legal basis to cancel the policy; whether HOF's policy was in effect at the time the loss occurred; and whether Summit breached any duties to HOF—and (ii) whether Nautilus accepted an overpayment of a post-cancellation

invoice for earned premiums that might estop it from asserting that HOF's policy was cancelled, we (1) sustain HOF's first, second, and fourth issues; (2) overrule HOF's third issue to the extent it seeks the rendition of a judgment in HOF's favor; (3) reverse, in part, the trial court's Order Granting Nautilus's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Second Motion for Partial Summary Judgment insofar as it granted Nautilus's summary judgment motion and dismissed with prejudice all of HOF's claims against Nautilus but affirm the order in all other respects; (4) vacate the trial court's severance order; and (5) remand this matter to the trial court for further proceedings consistent with this opinion.

/s/ Brian Walker

Brian Walker
Justice

Delivered: April 27, 2023